NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12210


COMMONWEALTH  vs.  GABRIEL CORDERO.



Berkshire.      February 14, 2017. - June 1, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, & Budd, JJ.


Search and Seizure, Motor vehicle, Threshold police inquiry,
     Reasonable suspicion.  Constitutional Law, Search and
     seizure, Investigatory stop, Reasonable
     suspicion.  Practice, Criminal, Motion to
     suppress.  Controlled Substances.




Indictments found and returned in the Superior Court
Department on May 11, 2015.

A pretrial motion to suppress evidence was heard by John A.
Agostini, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Duffly, J., in the Supreme Judicial Court
for the county of Suffolk, and the appeal was reported by her to
the Appeals Court.  The Supreme Judicial Court granted an
application for direct appellate review.


Merritt Schnipper for the defendant.
Joseph G.A. Coliflores, Assistant District Attorney, for
the Commonwealth.


GAZIANO, J.  We address in this case the authority of a

police officer to prolong a routine traffic stop in order to investigate suspected, unrelated criminal activity. The defendant argues that State police troopers and local police officers unreasonably detained him beyond the time required to accomplish the purposes of a traffic stop, in violation of the Fourth Amendment of the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, and thus that evidence seized from the trunk of his vehicle must be suppressed. The Commonwealth contends, in contrast, that an officer is not required to ignore incriminating facts that arise during the traffic stop, and that the facts gave rise to a reasonable suspicion to believe that the defendant was engaged in criminal activity. After a Superior Court judge denied the defendant's motion to suppress, a single justice of this court allowed the defendant's motion for interlocutory review by the Appeals Court, and we allowed the defendant's application for direct appellate review. We conclude that once a police officer has completed the investigation of a defendant's civil traffic violations, and the facts do not give rise to reasonable suspicion of criminal activity, the officer is required to permit the defendant to drive away. Therefore, we reverse the order denying the defendant's motion to suppress.[1]

---

[1] We need not reach the defendant's second argument, that the Commonwealth failed to prove that he unambiguously and

1.  Facts.  We present the facts as found by the motion judge, supplemented by uncontroverted testimony at the motion hearing.  Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).  On the evening of February 19, 2015, at approximately 6:50 P.M., as State police Trooper Noah Pack left the Massachusetts Turnpike in Lee, he observed a Toyota Camry being driven ahead of him with broken tail and brake lights.  He also noticed that the vehicle's windows were illegally tinted.  Pack did not immediately stop the vehicle.  Rather, he followed it while driving along Route 20, through Lee and Lenox, for approximately five miles.

While he followed the vehicle, Pack used his onboard computer to determine that the vehicle was owned by and registered to the defendant.  He also learned that the defendant's driver's license was current and valid and that the vehicle was properly registered, inspected, and insured.  Further, he obtained a photograph and other biographical information of the defendant, and learned that there were no

---

voluntarily consented to the search of the trunk of his vehicle. "Where the defendant seeks to suppress information obtained after unlawful police conduct, the issue is whether the evidence challenged has been obtained by exploiting the illegality." Commonwealth v. Fredette, 396 Mass. 455, 458-459 (1985), citing Wong Sun v. United States, 371 U.S. 471, 488 (1963).  Because we conclude that the prolonged seizure of the defendant was unconstitutional, any consent given during the illegal seizure was invalid.  See Commonwealth v. Torres, 424 Mass. 153, 163 (1997) ("consent obtained during an illegal detention is ineffective to justify an otherwise invalid search").

4

warrants for the defendant's arrest and that the defendant had no pending criminal charges. Pack also discovered that the defendant lived in Holyoke,[2] had been convicted of charges of firearms violations, drug offenses, and assault and battery on a police officer, and had been incarcerated for the drug-related convictions.

Pack stopped the vehicle, approached the driver's side, and asked the defendant to roll down the window. The trooper observed that the driver appeared to be the person in the Registry of Motor Vehicles photograph and that another man was seated in the passenger seat. Pack asked the defendant for his driver's license and registration.

While the defendant looked for these items, the trooper noticed that he seemed to be "extremely nervous," not making eye contact, stuttering when he answered questions, and offering information unrelated to the stop.[3] Pack asked the defendant "what brought him out this way" and "where he was coming from." The defendant answered that he was headed to a chain restaurant "up the road." Pack did not believe this statement because,

[2] Based on his law enforcement experience, the trooper believed that Holyoke is a "major drug source city" and that a "good percentage of the drugs coming into Berkshire County" came from Holyoke.

[3] The trooper testified that the defendant "was very talkative in that he offered his own speech about his own issues and what I perceived as an attempt to control the conversation and distract me."

while he had been following the defendant, they had driven past one such restaurant in Lee, and because the defendant had not specified the location of the restaurant where he was headed. When asked where he was coming from, the defendant said that he had been at his cousin's house "just behind him." Given that Pack had been following the defendant for more than five miles, he also doubted this explanation.

The defendant produced his driver's license but could not locate the vehicle's registration. The trooper asked the passenger for identification, and returned to his cruiser to run a records check on that information. Once inside the cruiser, Pack "called for assistance" and waited in his cruiser until a second trooper arrived "a few minutes later."

After the arrival of a second trooper, Pack returned to the defendant's vehicle "to test the window tint and have a brief conversation with [the defendant]." Proffering some paperwork, the defendant said that the brake light was out because he recently had been in an accident; he asked to get out of his vehicle to look at the tail light. The two went to the rear of the vehicle, where Pack pointed out the damaged lights and tested the vehicle's window tint.

Pack then told the defendant that he was "confused by [the defendant's] travel for the day" and questioned the defendant, who continued to show signs of nervousness, about his travels.

In response, the defendant said that he was going to see a friend, but did not provide the friend's name. Pack told the defendant that he suspected the defendant of drug activity and asked for permission to search the vehicle. The defendant said that he did not have any drugs in the vehicle and that "it ain't got to be like that." Pack interpreted this remark as a refusal of consent. He left the defendant standing with the second trooper at the rear of the vehicle and went to question the passenger. When the passenger also showed signs of nervousness and gave a different account of where the two had been that the trooper did not believe, he called over the police radio for a canine to be brought to the location to conduct a drug sniff.

Pack testified that, while they were waiting, the defendant asked the second trooper whether he could sit in the police cruiser to get out of the cold. Pack testified that the second trooper told the defendant that he could do so, but first would be required to submit to a patfrisk and then be handcuffed; the second trooper said that the defendant consented. A frisk of the defendant revealed $1,900 in cash in one of his pockets. After he had been handcuffed and placed in the back of the cruiser, the defendant told the second trooper that there was some marijuana in the glove box. Pack asked for permission to retrieve the marijuana from the vehicle, and did so after the

defendant agreed.[4]

Eventually, a Pittsfield police officer arrived on the scene. The officer asked the defendant if he would consent to a search of the trunk. The defendant responded only that he wanted to go home to his children. The officer asked a second time for the defendant's consent to search, and the defendant responded that all he had in his trunk was a plastic bag of clothes. When, for a third time, the officer asked for consent to search the vehicle, according to the officer, the defendant "gave consent for it."

After a search of the vehicle's trunk revealed roughly 2,000 bags of what the officers believed to be heroin, the defendant was placed under arrest. The entire duration of the roadside stop was between forty and forty-five minutes.

The defendant was charged with trafficking in heroin, G. L. c. 94C, § 32E (c); distribution of a class A substance as a subsequent offender, G. L. c. 94C, § 32E (b); motor vehicle lights violations, G. L. c. 90, § 7; and nontransparent window obstruction, G. L. c. 90, § 9D. The defendant was arraigned and filed a motion to suppress evidence seized from him during the traffic stop. A Superior Court judge denied the defendant's motion to suppress evidence seized from his vehicle during the traffic stop.

---

[4] The amount of marijuana in the vehicle was not criminal.

2. Discussion. a. Standard of review. "In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given . . . testimony presented at the motion hearing. . . . We review independently the application of constitutional principles to the facts found" (quotations and citations omitted). Commonwealth v. Amado, 474 Mass. 147, 151 (2016). See Commonwealth v. Cassino, 474 Mass. 85, 88 (2016) ("We make an independent determination of the correctness of the judge's application of constitutional principles" [quotations and citation omitted]).

b. Permissible bounds of a routine traffic stop. A routine traffic stop may not last longer than "reasonably necessary to effectuate the purpose of the stop" (citation omitted). Amado, 474 Mass. at 151. "It is well settled that a police inquiry in a routine traffic stop must end [when the purpose of the stop is accomplished] unless the police have grounds for inferring that 'either the operator or his passengers were involved in the commission of a crime . . . or engaged in other suspicious conduct'" (citation omitted). Commonwealth v. Torres, 424 Mass. 153, 158 (1997). See Commonwealth v. Gonsalves, 429 Mass. 658, 663 (1999) ("Citizens do not expect that police officers handling a routine

traffic violation will engage . . . in stalling tactics, obfuscation, strained conversation, or unjustified exit orders, to prolong the seizure in the hope that, sooner or later, the stop might yield up some evidence of an arrestable crime").

In Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015), the United States Supreme Court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' to address the traffic violation that warranted the stop."  See United States v. Sharpe, 470 U.S. 675, 685 (1985); Commonwealth v. Feyenord, 445 Mass. 72, 80 n.9 (2005), cert. denied, 546 U.S. 1187 (2006) ("It goes without saying that the driver cannot be held indefinitely until all avenues of possible inquiry have been tried and exhausted").  Police authority to seize an individual ends "when tasks tied to the traffic infraction are -- or reasonably should have been -- completed."  Rodriguez, supra. The police do not earn "bonus time" to conduct additional investigations by an expeditious performance of the traffic-related investigation.  The reasonableness of the stop depends on what the police, in fact, do to complete the purpose of the stop.  Id. at 1616.

Here, it is undisputed that the trooper was authorized to stop the defendant for civil traffic infractions.  See Amado, 474 Mass. at 151 ("Where the police have observed a traffic

violation, they are warranted in stopping a vehicle" [citation omitted]); Commonwealth v. Bacon, 381 Mass. 642, 644 (1980) (same). The trooper also was justified in conducting a roadside investigation related to the broken tail and brake lights, and the impermissible degree of the window tint. See Rodriguez, 135 S. Ct. at 1614 ("A seizure for a traffic violation justifies a police investigation of that violation"). The stop of the defendant's vehicle, however, could not last "longer than reasonably necessary to effectuate the purpose of the stop" (citation omitted). Commonwealth v. Cruz, 459 Mass. 459, 465 (2011).

By the time the trooper stopped the defendant's vehicle, he had acquired information from his onboard computer concerning the vehicle (i.e., that it was properly registered and insured) and the registered owner of the vehicle (i.e., that the defendant was a licensed operator who had no outstanding warrants). Thereafter, the trooper's roadside investigation reasonably included confirmation of the identity of the driver, testing the percentage of the vehicle's window tint, and writing citations for the motor vehicle violations. See Torres, 424 Mass. at 163 (investigation of routine traffic stop ends when purpose of stop is accomplished).

Once the defendant got out of his vehicle and the trooper finished testing the window tint and discussing with the

defendant the broken tail and brake lights, these tasks were completed.  Accordingly, because "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are -- or reasonably should have been -- completed," the investigation that followed was unreasonable unless supported by additional justification.  See Rodriguez, 135 S. Ct. at 1614.  See also Torres, 424 Mass. at 158 (police inquiry in routine traffic stop must end upon production of valid license and registration).

c.  Reasonable suspicion to extend investigation.  We turn next to consider whether, after the trooper had finished discussing the broken vehicle lights and window tint with the defendant, the trooper had reasonable suspicion to justify his investigation of criminal drug activity.

"In order to expand a threshold inquiry of a motorist and prolong his detention, an officer must reasonably believe that there is further criminal conduct afoot, and that belief must be based on 'specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience'" (citation omitted).  Feyenord, 445 Mass. at 77.[5]  "The dispositive issue, therefore, is whether,

---

[5] While a combination of nonsuspicious facts cumulatively may establish reasonable suspicion, see Commonwealth v. Fraser, 410 Mass. 541, 545 (1991) ("a combination of factors that are each innocent of themselves may, when taken together, amount to

after [the defendant] had complied with the usual requirements associated with a [traffic code] violation, a legally sufficient basis existed, in terms of reasonable suspicion grounded in specific, articulable facts . . . ."  Torres, 424 Mass. at 158.

When the trooper finished discussing with the defendant the broken lights and the window tint, the facts known to the trooper did not provide reasonable suspicion for a drug investigation.  At that point, the trooper knew the following: the vehicle was owned by and registered to the defendant; the defendant's driver's license was current and valid and the vehicle was properly registered, inspected, and insured; there were no outstanding warrants for the defendant's arrest; the driver of the vehicle was its registered owner;[6] and the defendant had no pending criminal charges.[7]

The Commonwealth's arguments that the trooper had reasonable suspicion of drug activity so as to justify further investigation are unavailing.  First, the Commonwealth notes that the defendant was "extremely nervous, making no eye contact

_____

the requisite reasonable belief"), "[a] hunch will not suffice." Commonwealth v. Wren, 391 Mass. 705, 707 (1984).

[6] The trooper's onboard computer had provided him with an identifying photograph of the defendant.

[7] The defendant's failure to produce his registration provided the trooper with the authority to issue a citation for a fine of thirty-five dollars under G. L. c. 90, §§ 11 and 20, for failure to carry a license or registration certificate.

and stuttering his speech in answering questions," and offering unrelated information to the trooper. That the defendant exhibited signs of nervousness and evasiveness in the context of an involuntary police encounter cannot, without more, generate reasonable suspicion. See Commonwealth v. Martin, 457 Mass. 14, 21 (2010), quoting United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005) ("Nervousness is a common and entirely natural reaction to police presence"). See also Gonsalves, 429 Mass. at 668-669 (officer's observation that passenger in taxicab was acting nervously did not support reasonable suspicion); Commonwealth v. Evans, 87 Mass. App. Ct. 687, 693 (2015) ("our cases have consistently held that 'a defendant's nervous movements or appearance alone is insufficient' to create reasonable suspicion" [citation omitted]).

Second, the defendant's evasive answers about where he had come from and where he was going did not give rise to a reasonable suspicion of illegal drug activity. See Rodriguez, 135 S. Ct. at 1615 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes . . . such inquiries . . . [as] checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" [citation omitted]). That the defendant had driven past a building housing one chain restaurant en route to another such

restaurant is innocuous, not sinister, and the inference to the contrary was unreasonable. Similarly, the defendant's statement that he was coming from his cousin's house "just behind him," which the trooper doubted given that he had followed the vehicle for over five miles, cannot support reasonable suspicion. See Commonwealth v. Warren, 475 Mass. 530, 538 (2016) ("evasive conduct in the absence of any other information tending toward an individualized suspicion that the defendant was involved in the crime is insufficient to support reasonable suspicion"); Commonwealth v. Mercado, 422 Mass. 367, 371 (1996) ("Neither evasive behavior, proximity to a crime scene, nor matching a general description is alone sufficient to support the reasonable suspicion necessary to justify a stop and frisk").

Third, the trooper's opinion that Holyoke was a "major drug source city" and that a "good percentage of the drugs coming into Berkshire County" came from there did not give rise to reasonable suspicion. The introduction in evidence of the trooper's opinion raises the same concerns that we have addressed in the context of "high crime" neighborhoods. We have held that a "high crime" neighborhood may be a proper factor in the reasonable suspicion analysis, see Commonwealth v. Johnson, 454 Mass. 159, 163 (2009), but "[j]ust being in a high crime area is not enough to justify a stop." Commonwealth

v. <u>Grandison</u>, 433 Mass. 135, 139 (2001).  We repeatedly have urged caution in the use of this consideration, pointing out that "many honest, law-abiding citizens live and work in high-crime areas.  Those citizens are entitled to the protections of the Federal and State Constitutions, despite the character of the area" (citation omitted).  <u>Commonwealth</u> v. <u>Gomes</u>, 453 Mass. 506, 512 (2009).  "The exercise of that caution necessarily means that we look beyond the term 'high crime area' to determine whether the inferences fairly drawn from that characterization 'demonstrat[e] the reasonableness of the intrusion'" (citation omitted).  <u>Commonwealth</u> v. <u>Meneus</u>, 476 Mass. 231, 238 (2017).

Similarly, a suspect's connection to a location that is called a drug "source city" cannot, standing alone, support reasonable suspicion.  Those travelling from a "source city" comprise "a very large category of presumably innocent travelers . . . who would be subject to virtually random seizures" were the "source city" consideration to justify a seizure.  See <u>Reid</u> v. <u>Georgia</u>, 448 U.S. 438, 441 (1980) (per curiam).  "[T]ravel from [a source city] cannot be regarded as in any way suspicious" because "the probability that any given . . . passenger from [a source city] is a drug courier is infinitesimally small.  Such a flimsy factor should not be allowed to justify  -- or help justify -- the stopping of

travelers . . . ." United States v. Andrews, 600 F.2d 563, 566 (6th Cir.), cert. denied, 444 U.S. 878 (1979). See United States v. Lambert, 46 F.3d 1064, 1070-1071 (10th Cir. 1995) (no reasonable suspicion where only information known to agents was that suspect departed from drug-source city, was flying alone, had one-way ticket he had purchased with cash, had checked one piece of luggage, and appeared nervous); United States v. Grant, 920 F.2d 376, 378-379, 384-385 (6th Cir. 1991) (no reasonable suspicion of criminal activity even though suspect came from "source city" for drug couriers, appeared nervous, did not produce his plane ticket on request, and did not have his name on flight manifest); United States v. White, 890 F.2d 1413, 1417-1419 (8th Cir. 1989), cert. denied, 498 U.S. 825 (1990) (no reasonable suspicion to justify detention of suspect after suspect deplaned from drug-source city, even though suspect arrived early in morning, purchased one-way ticket with cash, held carry-on bag closely with both hands, and appeared nervous). See also United States v. Wilson, 953 F.2d 116, 125 (4th Cir. 1991) (source city factor plays a relatively insignificant role in reasonable suspicion analysis).

Lastly, here, the defendant's prior convictions, without further specific and articulable facts indicating that criminal activity was afoot, could not create reasonable suspicion. While Massachusetts courts have commented that "knowledge of a

person's arrest record or unspecified 'criminal conduct' [may] be considered in a reasonable suspicion evaluation" (citation omitted), further evidence is required to support reasonable suspicion. Commonwealth v. Wright, 85 Mass. App. Ct. 380, 383 (2014), and cases cited. See id. at 384 (vehicle occupants' prior narcotics convictions, when combined with strong odor of air freshener and suspect's use of leased vehicle registered in State where neither occupant lived, supported reasonable suspicion).

The Commonwealth relies on Feyenord, supra, to justify the duration and intrusiveness of the search. See J.A. Grasso, Jr. & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 4-5[b] (2017) ("Even during an initially lawful stop, the character of the stop can change quickly"). The circumstances here, however, are not akin to those in Feyenord, 445 Mass. at 73, where the police officer stopped a suspect for a civil traffic violation. The officer's investigation of the traffic infraction evolved into a reasonable investigation of other potential crimes because the suspect "was unable to produce a [driver's] license," provided a Massachusetts registration that was not in his name, and gave the officer a false name and birthdate. Id. at 73-74.

The facts in this case differ in two important respects. First, unlike in Feyenord, 445 Mass. at 78, the trooper's

investigation of the traffic infraction revealed no facts that were manifestly suspicious, and, second, the trooper had completed most of his investigatory tasks before stopping the defendant, thereby reducing the time necessary for his roadside investigation.  See Commonwealth v. Locke, 89 Mass. App. Ct. 497, 501-502 (2016) (no reasonable suspicion despite odor of unburnt marijuana, presence of air fresheners, suspect's nervousness, and fact that passenger was staring silently ahead); Commonwealth v. Brown, 75 Mass. App. Ct. 528, 533, 537, 539 (2009) (suspect's "nervous looks" and "tense" appearance were "general descriptions [that] fall short of the 'specific and articulable facts' which are required to demonstrate reasonableness. . . .  It is not by itself sufficient that the point of encounter with police occurs in a high crime area. . . .  Although in hindsight [the officer's] hunch proved to be correct, we view the reasonableness of the search and seizure from the vantage preceding the discovery of the [evidence], and on that basis the actions of the police here exceeded constitutional grounds" [quotations and citations omitted]); Commonwealth v. Santos, 65 Mass. App. Ct. 122, 128 (2005) (no reasonable suspicion where suspect did not have his driver's license or vehicle registration in his possession, and where stop occurred in high crime area).

Ultimately, by the time the trooper finished discussing

with the defendant the broken lights and the window tint, the investigation of the civil traffic violations was complete. Because this investigation did not give rise to reasonable suspicion of criminal activity, the trooper did not have a legitimate basis to detain the defendant, and the defendant should have been allowed to drive away. See Torres, 424 Mass. at 163 (continued detention of defendant and passenger no longer necessary after defendant had satisfied purpose of stop by producing his license and registration; therefore, all evidence seized after that point must be suppressed as fruit of poisonous tree).

Order denying defendant's
motion to suppress
reversed.