The defendant was indicted for murder in the first degree in the stabbing death of Melvin Pina, Jr. (the victim). After a nine-day trial in Superior Court, a jury convicted the defendant of the lesser-included offense of murder in the second degree. On appeal, the defendant argues that his pretrial motion to suppress certain evidence should have been allowed, and that his trial counsel was ineffective for failing to re-raise the suppression issue at trial. The defendant also argues that the Commonwealth's evidence at trial was insufficient to support his conviction for murder in the second degree. We affirm.
1. Motion to suppress. a. The factual findings. Three police witnesses testified at the motion to suppress hearing (two State troopers and a New Bedford detective). The motion judge found all three "believable and reliable witnesses," and she "credit[ed] their testimony in its entirety." Based on the evidence before her and inferences she drew from that evidence, the judge made the following findings of fact:
"On March 17, 2012, the body of the victim, Melvin Pina ('Pina') was discovered in the back yard of a residence on Conduit Street in New Bedford. He had been stabbed to death. During the initial investigation, the police received information about possible suspects in the murder: two brothers, Isaiah and Jose Trinidad, and the defendant. The police learned that [the defendant] had warrants outstanding for motor vehicle violations and minor drug offenses. Armed with this information, the police went searching for [the defendant] in order to place him under arrest on the warrants and to speak with him about the incident. Their search brought the police to the second floor apartment located at 42 Edward Street, New Bedford, the apartment of the defendant's girlfriend, Tanya Franklin ('Franklin'), and the location at which the defendant was known to reside.
"At approximately 6:00 P . M ., Trooper Michael Chevren ('Chevren') ... accompanied by several other state and local police officers entered the building and ascended to the second floor apartment.... Chevren was familiar with forensics associated with crime scenes including the appearance of blood stains. The other officers included Trooper Zack Johnson ('Johnson'), Detective Michael Carrier ('Carrier') and Detective James Estrella ('Estrella') of the New Bedford Police Department.... All of the officers were dressed in plain clothes wearing jackets indicating that they were police officers. Their badges were displayed.
"Carrier knocked on the door. Franklin answered the door. The entry door was off the kitchen. Chevren and Carrier identified themselves as police officers. Without entering into the apartment or moving over the threshold, Carrier and Chevren asked Franklin if the defendant was home. The tenor of the conversation was polite and cordial. Franklin backed away from the door and motioned with her hand for the officers to enter the kitchen area of the apartment. Meanwhile, the defendant stepped into the kitchen from one of the adjoining rooms. He did not object to the police presence in his kitchen. Carrier motioned for the defendant to step outside the apartment. The defendant stepped into the hallway, leaving Chevren and Franklin in the kitchen. Several small children were also in the apartment.
"The defendant asked the officers if he could be provided with shoes to wear to the station. Franklin asked Chevren for permission to get the defendant a pair of shoes. Chevren followed Franklin to the threshold of the doorway leading into a bedroom to make sure she did not retrieve a weapon to provide to the defendant. Chevren observed a small folding knife on the dresser. He also saw a pile of dirty clothes, atop of which was a pair of jeans. Franklin retrieved the shoes and gave them to Chevren, who examined them to make sure they did [not] contain any weapons. The shoes were given to the defendant and he was removed from the scene by the police.
"During this interaction, Franklin initiated conversation with Chevren, asking him what 'this was all about?' Chevren asked her if she knew what the defendant was wearing the previous evening. In response, Franklin walked into the bedroom and grabbed a pair of jeans that were lying on top of a dirty pile of laundry in the corner of the bedroom. Chevren followed Franklin into the bedroom. Franklin did not tell Chevren to stay in the kitchen or to wait outside the apartment while she retrieved the jeans. Instead, she picked up the jeans and showed them to Chevren. Chevren observed what he believed, based upon his training and experience, to be bloodstains on the leg of the jeans. Simultaneously, Franklin made the same observation, after which she tried to hide the stains by folding one leg over the other. Chevren instructed Franklin to stop what she was doing. He advised her that they would be freezing the scene in order to secure a warrant. Based in part upon the observations made by Chevren of the knife and the bloodstained jeans, a warrant was obtained to search the apartment, resulting in the seizure of the knife, the jeans and other evidence."
In reviewing a judge's "ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.' " Commonwealth v. Scott, 440 Mass. 642, 646 (2004), quoting from Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002). The defendant has not demonstrated any clear error in the judge's subsidiary findings.
b. The scope of the defendant's argument. The dispute before us regarding the motion to suppress is a relatively narrow one. The defendant does not challenge the police's initial entry into the apartment to execute the arrest warrant. See Commonwealth v. Nova, 50 Mass. App. Ct. 633, 634-635 (2000) ("An arrest warrant encompasses the power to enter a residence for the purpose of executing the warrant"). Contrast Commonwealth v. Rogers, 444 Mass. 234, 240-241 (2005) (ambiguous gesture by person answering door did not justify warrantless entry into home). Moreover, although the defendant does not concede that Chevren was justified in following the defendant's girl friend in order to monitor her retrieval of the defendant's shoes, this is not the focus of his appeal in light of how little Chevren observed during that first trip to the bedroom. In any event, we conclude that in light of obvious potential safety concerns, it was reasonable and appropriate for Chevren to follow the girl friend to the bedroom when she retrieved the defendant's shoes. See Commonwealth v. Quilter, 81 Mass. App. Ct. 808, 810 (2012). See also Commonwealth v. Franco, 419 Mass. 635, 642 (1995) (where police who were inside residence to execute arrest warrant moved defendant to another room for proper purpose, they could seize contraband observed there in plain view).
What the defendant does actively contest is the validity of the actions that Trooper Chevren took after the arrest warrant was executed and the defendant was removed from the apartment. This included two related acts: Chevren's conversing with the girl friend in the kitchen and his following her to the bedroom the second time. The defendant maintains that without the resulting discovery of the bloody pants, the police lacked probable cause to obtain the search warrant through which they seized those pants and the knife. We address those contentions in order.
c. Chevren's conversation with the girl friend. Chevren's speaking with the girl friend in the kitchen was not itself a search; it was a conversation. In fact, it was the girl friend who initiated the conversation regarding "what 'this was all about.' " The record does not indicate that there was anything coercive about Chevren's making inquiries of the girl friend.[2] As the judge noted, the girl friend initially invited the officers into her apartment, Chevren's tone with her was "polite and cordial" throughout, and there is no indication that she at any point asked him to leave. See Commonwealth v. Cantalupo, 380 Mass. 173, 178 (1980) ("What, if any, limitations on the consent are implied by the language or conduct of the consenting party is a question in the first instance for the judgment of the police officers to whom the consent is given").
Nevertheless, the defendant argues that as soon as the police had executed the arrest warrant and removed the defendant from the premises, they had an affirmative obligation to leave the girl friend's apartment. Thus, the defendant suggests, the constitutional infirmity here was not in Chevren's making inquiries of the girl friend, but in his doing so at this particular place and time.
We disagree. Where, as here, the girl friend volunteered an openness to speaking with Chevren after the arrest warrant was executed, and she never indicated that he should leave, we discern no constitutional problem in Chevren's taking this opportunity to speak with her.[3] On this record, we decline to adopt a bright-line rule barring police who legitimately were inside a residence to execute an arrest warrant from engaging in conversations initiated by other occupants there as soon as the warrant has been executed. Contrast Commonwealth v. Cordero, 477 Mass. 237, 241-242 (2017) (establishing bright-line rule that absent additional justification, police cannot continue to detain occupants of vehicle stopped for routine civil traffic violations once tasks tied to traffic infraction are, or reasonably should have been, completed).[4]
d. The discovery of the bloody pants. Having concluded that Chevren did not violate any constitutional norms in speaking with the girl friend in the kitchen, we turn now to his second trip to the bedroom (during which he observed the defendant's bloody pants). We agree with the Commonwealth that the motion judge did not commit clear error in concluding that the girl friend had consented to Chevren's following her there in order that she could show him what the defendant had been wearing the night before. To be sure, she did not affirmatively invite him to follow her to the bedroom using her words. Nevertheless, her walking there in response to his question as to what the defendant wore the night before could have been understood as a nonverbal invitation to do so (particularly where Chevren already had accompanied her to the bedroom once).[5] The fact that-once back in the bedroom-the girl friend retrieved the defendant's pants and showed them to Chevren supports that it indeed was her intent that Chevren follow her when she left the kitchen. Contrast Commonwealth v. Suters, 90 Mass. App. Ct. 449, 455 (2016) (where defendant in presence of police officers entered basement room and closed door behind him, "a reasonable person in the position of the police officers would understand that any consent that may previously have been given by [his wife] with respect to entry into [that] room was withdrawn").
e. The seizure of the pants and the knife. With Chevren lawfully having observed the bloody pants, and armed with information that the defendant had been at the murder site, the application for the search warrant was amply supported.[6] Indeed, the defendant does not contend otherwise. Accordingly, we discern no error in the judge's denial of the motion to suppress.
2. Ineffectiveness of counsel. Defense counsel vigorously, if unsuccessfully, pursued the motion to suppress. When that was denied, he then unsuccessfully sought to pursue an interlocutory appeal of that denial. Nevertheless, the defendant now argues that his counsel was constitutionally ineffective for failing to renew the motion to suppress at trial. To succeed on his ineffective assistance claim, the defendant must show that his counsel's failure to renew the suppression issue at trial both fell "measurably below that which might be expected from an ordinary fallible lawyer" and "likely deprived the defendant of an otherwise available, substantial ground of defence." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974) (establishing familiar two-prong test for ineffective assistance).
The flaw in the defendant's ineffective assistance claim is that he is unable to identify any evidence that came out at trial that materially affected the suppression calculus. All he claims is that the trial evidence revealed "that the interaction [between Chevren and the girl friend] was longer and more detailed than initially reporte[d] by [Chevren] with [Chevren] asking more questions," and that this somehow "bolster[ed] the defense argument that [the girl friend] did not voluntarily consent to the continued police presence." The defendant has not demonstrated that any revelations that arose at trial regarding the precise nature of the conversation between Chevren and the girl friend so strengthened his suppression argument that his counsel was constitutionally ineffective for failing to renew the issue.
3. Sufficiency of the evidence. The defendant also argues that he was convicted of murder in the second degree based on legally insufficient proof. In a challenge to the sufficiency of the evidence, we examine whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), quoting from Jackson v. Virginia, 443 U.S. 307, 318-319 (1979). In addition, the sufficiency of the evidence "is to be measured upon that which was admitted in evidence without regard to the propriety of the admission." Commonwealth v. Sepheus, 468 Mass. 160, 164 (2014), quoting from Commonwealth v. Farnsworth, 76 Mass. App. Ct. 87, 98 (2010).
The Commonwealth presented evidence upon which the jury could find that the defendant, together with others, violently attacked the victim at an after-hours club, and that during this attack, the victim was stabbed in the chest (which caused his death). The apparent murder weapon was then found in the defendant's possession with traces of the victim's blood (despite the defendant's attempts to wash the blood off the knife). The pants that the defendant had been wearing that night were also stained with the victim's blood. Such evidence presented an ample basis on which rational jurors could find that the defendant "knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense." Commonwealth v. Zanetti, 454 Mass. 449, 468 (2009). Nothing more was required.
Judgment affirmed.

Nothing in the record indicates that Chevren's asking the girl friend questions in her own home remotely could be considered custodial. Compare Commonwealth v. Lavendier, 79 Mass. App. Ct. 501, 503-506 (2011) (significantly more intensive questioning of defendant in his cousin's home held not custodial). This is hardly surprising given that the girl friend herself was never a suspect, and had no reason to believe she was.
On appeal, the defendant suggests that the conversation between Chevren and the girl friend was inherently coercive because the two were of different races or ethnicities. The defendant did not press this argument in the trial court, and his factual premise is not established by the record.

We recognize that it may well be that, as a result of Chevren's seizing this opportunity, the girl friend was caught off guard by his questions. Although this may have made Chevren's efforts to investigate the victim's murder more effective, it does not mean that Chevren thereby violated the constitution.

As an alternative argument, the defendant suggests that even if Chevren was not constitutionally required to leave the apartment once the arrest warrant had been executed, we should hold that he had an affirmative duty to inform the girl friend that she had no obligation to speak with him. Again, the defendant has provided no citation that recognizes such a duty, and especially given that we lack the Supreme Judicial Court's superintendence powers, we have no basis for creating such a Miranda-like prophylactic rule here. At most, the case law indicates that where police made a request of a defendant to conduct a search without explaining his right to refuse that search, this is "a factor to be considered in assessing the voluntariness of the consent." Commonwealth v. Cantapulo, supra.

Notably, this is not a case where the police are contending that they had consent to rummage through the defendant's bedroom or otherwise to conduct an active search of it. The Commonwealth's narrow contention is that the police had consent to continue the conversation with the girl friend by following her to the bedroom.

We need not reach the Commonwealth's alternative argument that the police could have seized the pants without a search warrant.