NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-123                                    Appeals Court

COMMONWEALTH vs. JESSE HARRIS.

No. 17-P-123.

Suffolk.     December 18, 2017. - March 19, 2018.

Present:  Green, C.J., Vuono, Wolohojian, Kinder, & Englander,
JJ.

Constitutional Law, Search and seizure, Reasonable suspicion,
     Investigatory stop. Search and Seizure, Threshold police
     inquiry, Reasonable suspicion. Threshold Police Inquiry.
     Firearms. Evidence, Firearm, Knife, Flight. Practice,
     Criminal, Stipulation, Motion to suppress.


     Indictments found and returned in the Superior Court
Department on November 13, 2015.

     A pretrial motion to suppress evidence was heard by Robert
N. Tochka, J., and the cases were heard by Robert B. Gordon, J.,
on a statement of agreed facts.


     Rosemary Daly for the defendant.
     Meghan Joyce, Assistant District Attorney (L. Adrian
Bispham, Assistant District Attorney, also present) for the
Commonwealth.


     ENGLANDER, J.  This case raises an issue as to the

reasonableness of police conduct when the police engaged with,

and ultimately stopped and seized, persons walking in a public area. The defendant appeals from his convictions of illegal possession of a firearm and carrying a loaded firearm without a license, claiming that (1) the firearm was seized in violation of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, and (2) the trial judge failed to conduct the necessary waiver colloquy before convicting the defendant based upon stipulated facts. Because, as the Commonwealth acknowledges, the required colloquy did not occur, the judgments must be vacated and the findings set aside.

That leaves the search and seizure issue, which has been fully briefed and argued and which bears on any future proceedings. See Commonwealth v. Monteiro, 75 Mass. App. Ct. 280, 289 (2009). The seizure of the gun resulted from what began as a "casual" encounter between the defendant, his two companions, and the Northeastern University (university) police, outdoors on a September afternoon in the middle of the university's campus. The defendant contends that he and his companions were stopped or seized, for constitutional purposes, without the required reasonable suspicion, and that the gun accordingly must be suppressed. A Superior Court judge denied the defendant's pretrial motion to suppress the gun, concluding that the initial conversations with police were consensual and

that no stop occurred until after the police officers had observed a knife on the defendant's person, at which point the seizure became entirely justified.  We conclude that although the initial actions of the police were reasonable, the police unreasonably extended the encounter, and then seized the defendant before the knife appeared and without the requisite reasonable suspicion.

1.  Background.  a. Facts.[1]  This case arises, as our cases often do, out of ordinary police work that developed into a seizure and, ultimately, an arrest.  On September 23, 2015, Officers John Sweeney, Jonathan Sprague, and Andrew Good of the university police were working a day shift.  Officers Sweeney and Sprague were on mountain bicycles, while Officer Good was driving a marked police car.  These three officers were wearing university police uniforms.[2]

At 3:20 P.M., all three officers heard a radio broadcast stating, "two black males in their early 20's, one wearing a black hoody, and the other wearing a gray hoody, possibly with a third person, casing the bike racks by Snell [L]ibrary" at the university.  This information was initially provided by a

---

[1] The following facts are drawn from the motion judge's findings of fact, together with uncontested testimony adduced at the evidentiary hearing where the judge credited the witnesses' testimony.

[2] The officers have arrest powers pursuant to G. L. c. 22C, § 63.  See Commonwealth v. Smeaton, 465 Mass. 752, 756 (2013).

security officer employed by the university, who was stationed by the bicycle racks because the area was a high-crime area for bicycle theft.

Approximately twenty minutes after the broadcast, Officer Good saw two men fitting the broadcast description, along with a female, pass his car from the direction of the library.  The three people in the group were the defendant, the other male, Dakari Ferguson-Boone, and the female, Dajunnay Wade-Joseph.[3] The defendant and Ferguson-Boone were seated on bicycles, although Wade-Joseph had no bicycle and the three were walking together.  Officer Good got out of his car and called out to the group, asking if he could speak to them, but they continued to move away.

Officers Sprague and Sweeney then approached the group. Officer Sweeney said hello and asked if he could speak to the three.  Although the exact details and timing of the ensuing conversations are not spelled out in the judge's findings, initially the officers stated to the group that there had been a number of bicycle thefts in the area, and asked where the group was coming from.  The companions responded that they had eaten at Popeye's, a restaurant in the campus food court; at least one of the group was carrying a container from that restaurant.

---

[3] The defendant does not contest the motion judge's factual finding that he and Ferguson-Boone matched the description in the broadcast.

Soon thereafter a third officer arrived, Officer Jim Cooney, and three separate conversations ensued, in close proximity. Officer Sprague spoke with the defendant, Officer Sweeney spoke with Ferguson-Boone, and Officer Cooney with Wade-Joseph. The motion judge found that "[t]he officers' tone of voice was casual, conversational, and nonthreatening." The officers asked the two men to get off the bicycles and they complied, placing the bicycles on the ground. The officers asked whether the men had stolen the bicycles, and they responded that they had not.

Officer Sprague asked the defendant if he had previously had issues with the police, and he responded by raising his pant leg, revealing a GPS-monitored ankle bracelet. Officer Sprague then asked the defendant for identification, and the other two officers followed suit, asking for identification from Ferguson-Boone and Wade-Joseph. The defendant did not produce identification, but did orally provide his name, date of birth and address. Officer Sprague then stepped a short distance away from the group to call in the defendant's information to police dispatch, in order to conduct a criminal history and warrant check. Ferguson-Boone provided some form of identification card, which Officer Sweeney took and held, waiting for Officer Sprague to complete his conversation with dispatch. Wade-Joseph produced her university student identification card. While

these conversations were occurring, Officer Good and another officer came on the scene but "stood a distance away from the ongoing conservations."

As Officer Sprague was calling in the defendant's information, Officer Sweeney observed the defendant make a movement to his left side, causing his sweatshirt to ride up and expose a knife clipped inside of his waistband.  Officer Sweeney, "concerned for his and other officers' safety[,] grabbed the knife handle to remove it."

Officer Cooney then told the defendant to place his hands on his head because he intended to conduct a patfrisk.  The defendant began to comply, but then fled, chased by Officer Good.  While fleeing, the defendant dropped the firearm that is the subject of the motion to suppress.

The motion judge did not make a finding as to how long the encounter lasted from the time the officers first engaged the group until the defendant fled.  The witnesses gave a range of estimates, but the record reflects that the encounter was approximately ten to fifteen minutes.

The defendant was ultimately located and arrested, and charged with illegal possession of a firearm, in violation of G. L. c. 269, § 10(a); illegal possession of ammunition, in violation of G. L. c. 269, § 10(h)(1); and carrying a loaded

firearm without a license (FID card), in violation of G. L. c. 269, § 10(n).

b. Pretrial proceedings. The defendant filed a motion to suppress all items seized. After an evidentiary hearing, the motion judge denied the defendant's motion, finding that "[t]he initial encounter was not a stop or seizure" prior to the time the officer saw and seized the knife. The judge stated that asking the defendant for biographical information did not effect a seizure, and continued, "The fact that there were three officers speaking to the defendant and his friends does not make the consensual encounter a seizure. Each officer spoke separately to [the defendant] and his two friends. [Officers] Good and Cooney did not engage in conversation and stood about 100 yards from the interaction."

Finally, the judge concluded that the seizure of the knife was justified because it was a dangerous weapon on school grounds. See G. L. c. 269, § 10(j).

c. Trial. After a bench trial upon stipulated facts, the trial judge found the defendant guilty of all three charges and allowed the Commonwealth's dismissal of the charge of possession of ammunition without an FID card. This appeal followed.

2. Discussion. a. Motion to suppress. We deal first with the motion to suppress. The defendant's principal contention is that he and his two companions were stopped or

seized for constitutional purposes well before Officer Sweeney saw the knife on the defendant's person, that this initial stop or seizure was not justified by reasonable suspicion and was thus unlawful, and that the gun, and the defendant's arrest, are the fruits of that unlawful stop or seizure. The Commonwealth counters that the initial encounter was merely a field interrogation observation (FIO) -- an informal and voluntary conversation with the police that the defendant and his friends were free to exit. The motion judge agreed with the Commonwealth, concluding that no stop occurred until the officer saw and seized the knife, at which point a seizure was fully justified.

i. Stop and seizure. The first issue is when the stop or seizure occurred for constitutional purposes under the above facts. The legal standard is well settled: whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." Commonwealth v. Meneus, 476 Mass. 231, 234-235 (2017), quoting from Commonwealth v. Barros, 435 Mass. 171, 173-174 (2001). In applying this standard, "we accept the [motion] judge's subsidiary findings of fact absent clear error." Commonwealth v. Contos, 435 Mass. 19, 32 (2001), quoting from Commonwealth v. Eckert, 431 Mass. 591, 592 (2000). Accord Commonwealth v. Lyles, 453 Mass. 811, 814 (2009). "However, we review

independently the motion judge's application of constitutional principles to the facts found." Commonwealth v. Franklin, 456 Mass. 818, 820 (2010).

The case law makes clear that police are free to approach persons on the street, to engage in conversation, and to ask questions of them, without such encounters raising constitutional issues. The police are not different from ordinary persons in this regard. The persons approached, of course, have no obligation to respond and are free to walk away. If the police communicate otherwise -- by word or action -- that the person they are speaking to is not free to terminate the conversation or to walk away, then the situation changes and reasonable suspicion, at least, is required. In applying the "free to leave" standard, courts evaluate whether the police have applied coercive power, such that a person's liberty to walk away has been materially restrained. See Barros, 435 Mass. at 174-176.

The question is an objective one, based upon the totality of the circumstances, and although the answer in any particular case is necessarily fact-dependent, we have some helpful guide posts. In Lyles, 453 Mass. at 813-814, the Supreme Judicial Court held that where a police officer asks for and obtains an identification card (ID card) from a subject, a "seizure" has occurred for constitutional purposes -- at least while the

officer retains the ID card. The court reasoned that given the importance of identification, such as a driver's license, in today's society, a person who has relinquished his identification would not feel free to terminate the encounter and leave. See id. at 815-816. Nor would such a person feel that he could demand that the identification be immediately returned. See also Barros, 435 Mass. at 175-176 (officer's follow-up command to "come here" sufficient to constitute a stop); Commonwealth v. Depina, 456 Mass. 238, 241-242 (2010); Commonwealth v. Evans, 87 Mass. App. Ct. 687, 689-693 (2015).

On the facts here we conclude that a stop occurred, for constitutional purposes, at least by the time the officers secured identification from each of the companions and began calling in that information so that record checks could take place. By that point, what began as an informal "field interrogation" had crossed the line into a coercive exercise of police power. The men had been asked to alight from their bicycles. The interrogation had lasted for several minutes and had taken on a more formal character, with three separate conversations ongoing. And once identification was requested, received, and called in, we do not believe any of the subjects, objectively, would reasonably have felt free to leave. See id. at 690. Under Lyles, a stop and seizure had clearly occurred with respect to each of the defendant's companions, and we do

not think the defendant's circumstances were materially different.  He had provided his personal information orally, and Officer Sprague was engaged in calling it in.  See Lyles, 453 Mass. at 813-816.  Our conclusion is buttressed by Officer Sprague's testimony that while he was calling in to dispatch, the other officers were "keeping their eye" on the defendant and Ferguson-Boone "so that neither . . . would leave while [Officer Sprague] was getting that information."

ii.  Reasonable suspicion.  Having concluded that a stop occurred for constitutional purposes prior to the observation of the knife, the next question is whether, at the time of the stop, the police had the requisite reasonable suspicion.  Under our cases, a stop requires reasonable suspicion of identifiable criminal activity -- "that a person has committed, is committing, or is about to commit a crime."  Commonwealth v. Sykes, 449 Mass. 308, 314 (2007), quoting from Commonwealth v. Silva, 366 Mass. 402, 405 (1974).  We conclude that at the time of the stop, the officers lacked such reasonable suspicion.[4]

When the police first approached the group they knew (1) that there had been a report, then twenty minutes old, that two men had been observed "casing" the university's bicycle racks,

---

[4] No argument was advanced that the defendant was entitled to less constitutional protections due to his ankle bracelet, so we do not address that issue.

(2) that the two men in the group matched the description given, and (3) that those two men were now on bicycles.

On the above facts it was surely reasonable for the officers to approach the men to investigate possible bicycle theft, which is what the officers did. They approached and asked, inter alia, questions directed to how the men had obtained the bicycles. Indeed, the officers did so initially without effecting a stop or seizure in the constitutional sense; the initial questioning was consensual and noncoercive. But importantly, over the next several minutes they learned nothing that could have added to their suspicions. The men stated the bicycles were not stolen. One of the group was a student at the university, and their explanation that they had been in the food court was readily verifiable from the food they carried. And the police testified, at the motion to suppress hearing, both that they had no reason to disbelieve the men and that they had no knowledge that any bicycle theft had occurred.

At that point, once the police had knowledge that the bicycles were not stolen, they had no basis to effect a constitutional seizure because there was not then a reasonable basis to believe that a crime had occurred, or was likely to occur. The only possible criminal activity they were aware of involved bicycle theft. But they had no information that bicycle theft had <u>actually</u> occurred, and while observed "casing"

can, of course, be a basis for a stop, there must be reasonable suspicion at the time of the stop that a crime is likely to occur.  See Terry v. Ohio, 392 U.S. 1, 6 (1968).  Here, there was no sign that a theft was likely -- the men were encountered some distance from and moving away from the bicycle racks, with lunch in their hands.  If any "casing" had occurred previously, it had plainly ended some time ago.

The touchstone of search and seizure law is reasonableness, and in this context reasonableness has at least two dimensions -- the reasonableness of initiating an encounter, and the reasonableness of the scope of the encounter.  See Commonwealth v. Gomes, 453 Mass. 506, 509 (2009), quoting from Commonwealth v. Wilson, 441 Mass. 390, 393-394 (2004) ("In 'stop and frisk' cases our inquiry is two-fold:  first, whether the initiation of the investigation by the police was permissible in the circumstances and, second, whether the scope of the search was justified by the circumstances").  Here, there was no sound basis for the police to extend the encounter beyond its initial purpose by requesting identification and conducting a criminal history or warrant check.  By the time the constitutional stop and seizure occurred, reasonable suspicion was lacking.

Just recently in Commonwealth v. Cordero, 477 Mass. 237 (2017), the Supreme Judicial Court expressed a similar principle in the context of a traffic stop that turned into an arrest for

possession of drugs.  There, the police lawfully stopped the defendant for a broken taillight, broken brake lights, and an impermissible degree of window tint.  See id. at 242.  However, the police prolonged the stop by questioning the driver about his travel history that day, and maintained the stop well after the time needed to document the results of the traffic investigation.  See id. at 242-247.  The continued questioning, which included repeated requests to search the vehicle, ultimately resulted in a search of the vehicle's trunk, in which the officers found a considerable amount of what they believed to be heroin.  See id. at 240-241.

The Supreme Judicial Court concluded the drugs must be suppressed.  While the initial stop was lawful, "[a] routine traffic stop may not last longer than 'reasonably necessary to effectuate the purpose of the stop.'"  Id. at 241 (citation omitted).  The court stated:

> "Ultimately, by the time the trooper finished discussing with the defendant the broken lights and the window tint, the investigation of the civil traffic violations was complete.  Because this investigation did not give rise to reasonable suspicion of criminal activity, the trooper did not have a legitimate basis to detain the defendant, and the defendant should have been allowed to drive away."

Id. at 247.

In this case, the police exercised coercive power to effect the stop and seizure before they observed or knew anything of the knife in the defendant's waistband.  At the time they

effected the stop they lacked reasonable suspicion of an existing or intended crime. The defendant and his companions accordingly should have been left to move on. The subsequent seizure of the knife, the defendant's flight, and the recovery of the gun are all fruits of the unlawful stop and should have been suppressed.

b. Lack of colloquy before trial on stipulated facts. Finally, we note that the judgments would have had to be vacated regardless of our conclusion on the suppression issue, because the trial judge failed to conduct the required colloquy before proceeding with the trial based upon stipulated facts. The defendant stipulated that the seized firearm had been in his "exclusive possession," that it contained ammunition, and that he had no "valid FID card." These facts constituted all the elements of the crime charged, and the stipulation was thus the equivalent of a guilty plea. A judge may not conduct a trial on such stipulated facts without first having a colloquy to establish the defendant's knowing and voluntary waiver of his constitutional rights, including rights against self-incrimination and to confront the witnesses against him. See Commonwealth v. Lewis, 399 Mass. 761, 763-764 (1987).

Here, the trial judge conducted a colloquy regarding the defendant's waiver of trial by jury, but did not conduct the

required colloquy regarding the defendant's stipulation to facts that established guilt.

3. <u>Conclusion</u>.  The judgments are vacated, and the findings are set aside.

<u>So ordered</u>.