The defendants, Leary E. Bruce and David Williams, were each indicted on one count of trafficking in cocaine. Both appeal from the order denying their motions to suppress physical evidence and statements obtained as a result of the routine traffic stop that led to their arrests.[3] They argue, among multiple other claims of error, that the Superior Court judge should have allowed the motions because the State trooper prolonged the traffic stop for longer than what was reasonably necessary to effectuate its purposes. We agree and thus reverse.
Background. We summarize the judge's factual findings, supplemented with undisputed testimony that she implicitly credited. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015). State Trooper Joshua Rucho was on patrol in Springfield when, at approximately 1:25 A.M. , he observed a vehicle traveling in the opposite direction with an unlit rear license plate. Rucho made a U-turn and activated his spotlight and emergency blue lights to signal the vehicle to stop. Instead of stopping immediately, the vehicle traveled about 130 feet before pulling into the parking lot of a condominium complex.
Rucho observed three occupants in the vehicle: a white female in the driver's seat; a black female, later identified as Bruce, in the front passenger seat; and a black male, later identified as Williams, in the back seat. While the driver was retrieving her license and registration, Rucho asked her where she was traveling to and where she was coming from. The driver stated that she was going home to Brattleboro, Vermont, after picking up her two passengers at "the chicken place." When Rucho asked who the passengers were, the driver identified the front seat passenger, Bruce, as "J" and the back seat passenger, Williams, as "T." The driver's voice was trembling, and she appeared shaky.
Rucho observed that neither defendant was wearing a seatbelt and asked for identification so he could issue citations. Williams produced a New York State driver's license. Bruce did not have a license but verbally gave her full name, "Leary Bruce," and her date of birth. Noticing that the names provided by the defendants did not match the initials provided by the driver, Rucho asked the driver again about her passengers. She replied that they were friends of friends. When Rucho then asked why she pulled into the parking lot, the driver stated that she thought the condominium complex was a hotel. Rucho found this response to be suspicious because the driver had earlier told him that she was going home to Brattleboro.
"[D]ue to the inconsistent stories," Rucho called for back-up and asked the driver to exit the vehicle. Once she did so, Rucho again asked for information about the passengers. The driver continued to maintain that the front seat passenger was "J" or "Jasmine" and the rear seat passenger was "T." She also stated that they were friends of her boy friend and were in town for the weekend as she and her boy friend were getting married.
After Trooper Kenneth Belben arrived at the scene, Rucho went to Williams and asked how he knew the driver and Bruce. Williams replied that he met the driver online. "[D]ue to his story being different from the [driver's] story," Rucho ordered Williams out of the car and conducted a patfrisk for weapons, finding none. Rucho then asked Williams why he was going to Vermont. Williams replied that he and Bruce had met the driver online and that they had come to the area to "have a good time." He also stated that he and "Leary" had been dating for one or two months but he did not know her last name. At this point Rucho handcuffed Williams and placed him in the cruiser, stating that he was doing so "for everyone's overall safety ... so [he] could further investigate the motor vehicle stop."
Rucho next ordered Bruce to exit the vehicle. Upon questioning, Bruce stated that she and "David" had been in a sexual relationship for about one month but she did not know his last name. When asked how she knew the driver, Bruce did not respond.
Rucho returned to the driver and stated that he did not believe their stories and thought they were engaged in illegal activity because "the [Interstate] 91 corridor ... is known for the trafficking of narcotics." The driver denied that there were drugs in the vehicle and consented to a search. In the back seat, Rucho found a backpack containing empty wax paper bags, which he recognized as the type that could be used for packaging heroin. After giving the driver Miranda warnings, Rucho advised her of what he found and that he suspected there were drugs either in the vehicle or on one of the occupants. The driver became upset, denied any knowledge of drugs in the vehicle, and said she had been told to pick up the two passengers. Rucho proceeded to give Miranda warnings to the defendants, each of whom denied having drugs.
As Rucho continued to search the vehicle, Belben saw Bruce looking nervously towards Williams, who was still seated in the cruiser. Belben told Bruce that he suspected she had drugs on her person, prompting her to reply that "if she was going to give them up, ... it was on her, she was totally responsible for it, and David had nothing to do with it." Upon learning of these statements, Rucho advised Bruce that he knew she had admitted having drugs and asked if she would be willing to retrieve them. She responded affirmatively, went into Belben's cruiser, and reached into her underwear and produced a cylinder-shaped item, which was hard and white and wrapped in a rubber glove. Rucho believed that the item was "crack" cocaine.
Rucho then asked the driver whether there was heroin in the vehicle. She again became upset and stated that her only purpose was to give the passengers a ride and that she knew they would be transporting drugs but did not know what kind. Eventually, Rucho released the driver after giving her a summons for defective equipment and conspiracy. He arrested both defendants and transported them to the police barracks, where Williams gave a statement admitting that the backpack was his.
Discussion. "In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error" but "review independently the application of constitutional principles to the facts found." Commonwealth v. Amado, 474 Mass. 147, 151 (2016), quoting from Commonwealth v. Wilson, 441 Mass. 390, 393 (2004). Although the defendants challenge the judge's decision on multiple grounds, we need address only one-that Rucho unreasonably prolonged what should have been a routine traffic stop.
"A routine traffic stop may not last longer than 'reasonably necessary to effectuate the purpose of the stop.' " Commonwealth v. Cordero, 477 Mass. 237, 241 (2017), quoting from Amado, 474 Mass. at 151. Thus, absent reasonable suspicion of criminal activity that justifies further inquiry, "[p]olice authority to seize an individual ends 'when tasks tied to the traffic infraction are-or reasonably should have been-completed.' " Id. at 242, quoting from Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015).
Assuming the legitimacy of the initial stop,[4] Rucho was allowed to make "inquiry into the status of the driver as a licensed operator and the registration of the automobile." Commonwealth v. Bartlett, 41 Mass. App. Ct. 468, 470 (1996). He was also justified in prolonging the stop to issue the defendants citations for the seatbelt violations. See Cordero, 477 Mass. at 242. But once Rucho obtained a license and registration from the driver, a license from Williams, and Bruce's full name and birth date, he had all of the information reasonably necessary to issue the respective citations. At that point, unless he had other justification for prolonging the stop, he should have written the citations and permitted the group to leave. See Commonwealth v. Torres, 424 Mass. 153, 158 (1997) (absent other justification, "police inquiry in a routine traffic stop must end on the production of a valid license and registration"); Cordero, 477 Mass. at 247 ("[B]y the time the trooper finished discussing with the defendant the broken lights and the window tint, the investigation of the civil traffic violations was complete ..., and the defendant should have been allowed to drive away"); Bartlett, 41 Mass. App. Ct. at 471 ("If the driver produces a valid license and registration, there is ordinarily no reason for an officer to probe further").
The Commonwealth contends that Rucho was warranted in investigating further because of the supposed inconsistency between the names given by the defendants and the initials given by the driver. But even accepting that he genuinely considered this to be an inconsistency (despite it being clear that the driver did not know her passengers' full names), Rucho had enough information from the defendants themselves to verify their identities without making inquiry of the driver. This was "not a 'swiftly developing situation' that prevented verification or disproof of the officer's suspicions regarding the defendant[s'] identit[ies] ... through routine computer or radio checks." Commonwealth v. Santos, 65 Mass. App. Ct. 122, 126 (2005), quoting from Commonwealth v. Sinforoso, 434 Mass. 320, 325 (2001). Although the Commonwealth asks us to assume that Rucho did try to confirm the defendants' identities-because "no evidence" was presented at the hearing that he did not-the burden of proof at the hearing was on the Commonwealth, not on the defendants. See Commonwealth v. DePeiza, 449 Mass. 367, 369 (2007). Rucho did not testify, and the judge did not find, that he ran any sort of records check once he received the defendants' identifying information, which would have revealed that he did in fact have their true names. To the contrary, the only reasonable inference from Rucho's testimony is that he did nothing with the information.[5] Instead, he immediately called for back-up, ordered the occupants out of the vehicle and continued to question them, and searched the vehicle and Williams's backpack while Williams sat handcuffed in the cruiser. These actions plainly exceeded what was reasonably necessary to issue citations for the civil traffic infractions.
The continued detention of the defendants was therefore unlawful unless Rucho had reasonable suspicion that "there [was] further criminal conduct afoot ... based on 'specific and articulable facts' " of criminal activity. Cordero, 477 Mass. at 243, quoting from Commonwealth v. Feyenord, 445 Mass. 72, 77 (2005), cert. denied, 546 U.S. 1187 (2006). The Commonwealth concedes that the earliest Rucho could have possibly formed reasonable suspicion was when he discovered the wax paper bags in Williams's backpack.[6] Thus, as Rucho had no additional justification for inquiring further once the defendants turned over their identifying information, the motions to suppress should have been allowed.
Order denying motions to suppress reversed.

A single justice of the Supreme Judicial Court allowed the defendants' applications for leave to file an interlocutory appeal. The appeals were not formally consolidated but arise from the same proceedings and were heard together at oral argument.

Although Williams concedes that the initial stop was lawful, Bruce argues that it was not because the Commonwealth "failed to prove that the license plate ... was not plainly visible at a distance of sixty feet," as she says was required to establish a violation of G. L. c. 90, § 6. We note, however, that G. L. c. 90, § 7, as appearing in St. 1978, c. 439, § 1, requires all motor vehicles to "be equipped with ... a white light so arranged as to illuminate and not obscure the rear number plate," which indicates that the lack of a light is itself an infraction regardless of whether the plate is visible from sixty feet. In any event, given our ruling, we need not resolve this question.

When asked on cross-examination whether he did "anything else about getting the proper IDs," Rucho replied, "I don't believe so, no."

The judge found that "the three occupants of the [vehicle] ... engaged in no furtive movements" and "were cooperative with [the] police officers and responded to the police officers' questions."