KAFKER, J.
**695 A jury convicted the defendant, Paulo Tavares, of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.[1] On appeal, the defendant raises three main issues. First, he argues that a Superior Court judge (motion judge) erred in denying his pretrial motion to suppress evidence obtained from the search and seizure of a motor vehicle in which he was a passenger. Second, he argues that a second Superior Court judge (trial judge) improperly admitted evidence of the defendant's involvement in a prior shooting. Finally, he argues that the trial judge erred in denying the defendant's postconviction motions for a new trial based on ineffective assistance of counsel and for discovery of wiretap recordings of his conversations with a confidential informant.
For the reasons set forth infra, we conclude that the motion judge committed reversible error in denying the defendant's motion to suppress. We also find that the defendant's motion for a new trial was properly denied, but that his motion for discovery should have been granted. Accordingly, we vacate the convictions and remand for a new trial consistent with this opinion.[2]
*987 Background. We recite the facts the jury could have found, reserving certain details for discussion of legal issues.
On the evening of May 21, 2007, John Lima was driving his sister's Nissan Altima automobile, along with his friend Jorell Archer, on a street in Brockton. According to Archer, another car sped up and began to "tail" them with its high beam lights activated. Lima became "aggravated" and applied his brakes, giving the car behind him a "brake job" as it followed them. The other car then drove up to the passenger's side of the Altima, and someone fired seven or eight gunshots at them.
**696 Lima attempted to shield himself from the shots but could not do so because he was driving. He then turned into a nearby parking lot, where the Altima slowed down and rolled into an apartment building. At that point, Archer noticed that Lima had been shot. Lima stated, "I'm hit, I'm hit," and twice indicated to Archer that he believed he was dying. The other car quickly sped away before Archer could determine the type of car or the number of people inside it.
Police found the Altima crashed into the building with all four of its windows shattered. Archer was standing in front of the open driver's side door, while Lima was lying unresponsive in the driver's seat. Lima was immediately transported to the hospital, where he died shortly thereafter. An autopsy later revealed that he had been shot three times. The medical examiner concluded that the cause of death was due to gunshot wounds.
At the scene, the police interviewed an eyewitness, Nicholas Melo, who had been sitting on his porch when he heard eight or nine loud bangs. Melo then witnessed a car round the corner near his house, hit the curb, and speed down the street. Melo initially told the police that he saw a Chevy Malibu Max, but later described it as a regular Chevy Malibu.
The day after the shooting, a police officer, accompanied by a State police trooper, was driving in an unmarked police cruiser in Brockton when he passed a Chevy Malibu. The officer began searching for the Malibu, believing that he recognized an individual with an active arrest warrant in the back seat. A few minutes later, he identified the Malibu and stopped it.
As he approached the vehicle, the officer quickly realized that the individual he was looking for was not in the back seat. Instead, he found Christopher Hanson in the driver's seat, the defendant in the front passenger's seat, and Eddie Ortega in the back seat. The officer made brief conversation with the three occupants before learning that Hanson was not on the rental agreement for the vehicle. The officer then advised Hanson that because he was not listed on the rental agreement, the vehicle would have to be towed. All three occupants left on foot. The officers did not search the Malibu before towing it to the police station. The officers then brought Melo to the police station, where he told the officers that he was "sure" that the Malibu was the same car he had seen the night before and stated that it should have scrape marks underneath the front driver's side quarter and the rear passenger's side quarter -- where the car had gone over the curb.
**697 He and a detective both looked under the Malibu, and the detective observed what appeared to be fresh scrape marks in the area where Melo said they would be.
At trial, Ortega testified about the moments immediately preceding the motor *988 vehicle stop. While riding in the back seat of the Malibu, Ortega heard the defendant and Hanson discuss the shooting that had occurred the previous night. During this conversation, the defendant stated that he had shot the wrong person, and that the shooting was not supposed to "go down" like it had. Ortega also heard the defendant admit to using a .22 caliber handgun in the shooting. Additionally, Ortega testified that just before the vehicle was stopped, Hanson quickly turned onto a side street. At that moment, the defendant took a .22 caliber handgun out of the glove compartment and threw it onto a nearby residential lawn. After their encounter with the police officer, the three occupants returned to the side street and retrieved the gun.
The Commonwealth's primary witness at trial was Raymond Grinion, one of the defendant's friends and business associates. The defendant and Grinion sold drugs together in Brockton. For several years prior to the shooting, Grinion worked on and off with Brockton Police Detective Christopher McDermott as a paid confidential informant.
Sometime between December 2006 and January 2007, Grinion stole a .22 caliber handgun from a residence in New Hampshire. He kept it for about two weeks before selling it to Jose Santos. In March or April 2007, Santos gave the handgun to the defendant. Grinion testified that he saw the defendant in possession of the gun "on numerous occasions."
The day after the shooting, Grinion received a call from the defendant. During the call, the defendant told Grinion to get rid of his cell phone because the police had "snatched up" his girlfriend and she had given his cell phone number to them. When Grinion asked for details, the defendant responded that it was about the "homeboy" he had "bodied last night." Grinion testified that he believed this to mean that the defendant had killed someone the night before.
Following this conversation with the defendant, Grinion apparently told Detective McDermott that he believed the defendant was involved in the murder of Lima. He also informed McDermott that the defendant admitted to using a .22 caliber handgun in the shooting. Grinion then made arrangements with the police to conduct a controlled purchase of the gun from the defendant.
**698 Over the next several days, the defendant made various incriminating statements to Grinion about his involvement in the shooting. Two days after the shooting, Grinion told the defendant that Santos was upset about the murder of Lima. In response, the defendant stated, "I know that. That was my man too," and he further indicated that "it was the wrong dude. We hit the wrong dude." The defendant also stated that he was not worried about his earlier encounter with the police because "he ha[d] shooting cases in the past," and because he knew "how to get out of the car and to shoot." He further explained that the officer was joking with him and that "he [didn't] think they [had] much evidence." A few days later, Grinion met the defendant at an apartment in Fall River, where he saw the defendant with the .22 caliber handgun.
On May 28, 2007, Grinion conducted a controlled purchase of the .22 caliber gun from the defendant.[3] When he gave Grinion the gun, the defendant instructed him *989 not to "drop any of the shells" if Grinion used the gun because it was connected to a murder and another shooting. Grinion asked whether the defendant had used the gun to kill someone, and the defendant responded that "whoever bought it, they don't need to know all that."
On May 31, 2007, Grinion returned to the apartment to meet with the defendant. At that time, Grinion again told the defendant that Santos was upset about the shooting. The defendant became irritated and responded that Grinion had "a big mouth." He also indicated that he did not want Santos to know that he had lied about his involvement in the murder.
On June 1, 2007, the police executed an arrest warrant for the defendant. The police then searched the Fall River apartment and recovered thirteen .22 caliber live rounds. At trial, the Commonwealth introduced ballistics evidence collected from the scene of the shooting, which occurred on Main Street (Main Street shooting), including several .22 caliber shell casings. A ballistics expert compared these shell casings to the .22 caliber gun recovered from the controlled purchase, and concluded that at least some of the casings were fired from that gun.
Over the defendant's objection, the Commonwealth also introduced evidence relating to the defendant's involvement in an **699 earlier shooting that occurred about one month prior to Lima's killing on Exchange Street in Brockton (Exchange Street shooting). Grinion testified that the defendant admitted to using the .22 caliber handgun in the Exchange Street shooting. A ballistics expert also confirmed that three .22 caliber shell casings recovered from the scene of the prior shooting were fired from the .22 caliber handgun introduced in this case.
The jury eventually returned guilty verdicts on all three charges. The defendant now appeals.
Discussion. 1. Motion to suppress. The defendant argues that the motion judge erred in denying his pretrial motion to suppress evidence obtained from the search and seizure of the Malibu.
In reviewing the denial of a motion to suppress, we accept the motion judge's "subsidiary findings absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law" (quotations omitted). Commonwealth v. Jones-Pannell, 472 Mass. 429, 431, 35 N.E.3d 357 (2015), quoting Commonwealth v. Ramos, 470 Mass. 740, 742, 25 N.E.3d 849 (2015). The judge's subsidiary findings may be supplemented with "uncontroverted and undisputed" evidence "where the judge "explicitly or implicitly credited the witness's testimony." Jones-Pannell, supra, quoting Commonwealth v. Isaiah I., 448 Mass. 334, 337, 861 N.E.2d 404 (2007), S.C., 450 Mass. 818, 882 N.E.2d 328 (2008).
a. Relevant facts. We recite the facts as found by the motion judge. In the middle of the afternoon on May 22, 2007, Brockton Police Detective Michael Schaaf and State Police Trooper Robert Fries were driving an unmarked police cruiser in Brockton. The two were assigned to warrant apprehension duty. Earlier that day, Detective McDermott briefed Schaaf about the prior night's shooting and summarized Melo's description of the suspect vehicle. Specifically, McDermott described the suspect vehicle as a Chevy Malibu Max that was "tannish or goldish in color" and had a "sloped back." He also stated that Melo believed the vehicle would have scrape marks on the bumper. McDermott distributed copies of a printed photograph, provided by Melo, depicting what Melo believed the vehicle looked like.
*990 Later that afternoon, while traveling on a street in Brockton, Schaaf observed a "grayish-green" Chevy Malibu headed in the opposite direction. From the police cruiser, Schaaf observed three occupants in the vehicle. Based on a three-second view of the vehicle, Schaaf believed that the rear passenger was Jose Correia, an individual who had an outstanding arrest warrant.
Schaaf and Fries reversed their direction, losing sight of the vehicle for about a minute before eventually finding it again.
**700 From this position, Schaaf was only able to view the back of the rear passenger's head. Schaaf thereafter effected a stop by activating the cruiser's lights.
Schaaf approached the vehicle on the driver's side, while Fries approached from the passenger side. As he approached, Schaaf realized that the rear passenger was not Correia. He apologized to the three occupants and informed them that he had mistakenly thought the rear passenger saw someone else. Schaaf had some familiarity with the passengers, and they recognized him.[4] The occupants and Schaaf then engaged in some small talk.
While talking with the occupants, Schaaf asked Hanson for his driver's license. Hanson provided a valid driver's license and told Schaaf that the defendant had rented the vehicle. Schaaf was then informed that the defendant's girlfriend had in fact rented the vehicle. Based on this verbal exchange, Schaaf asked to see the rental agreement. He reviewed the agreement and observed that none of the vehicle's occupants was listed as authorized operators.
Schaaf then informed all three occupants that they were not allowed to drive the vehicle, and that he intended to secure the vehicle for the renter to retrieve it. The three occupants left on foot. Schaaf did not conduct a search of the vehicle or the occupants at that time.
After the occupants had left the scene, Schaaf realized that the vehicle might be the same vehicle suspected of being involved in the prior night's shooting. He noted that although the vehicle was a regular Chevy Malibu, not a Malibu Max as Melo had initially described, and was "grayish-green" rather than gold or tan in color, he believed it had a "sloped back" similar to Melo's description. Schaaf then contacted Detective McDermott and described the vehicle to him. Based on Schaaf's description, McDermott ordered the car towed to the police station, where it was parked in the station's garage and cordoned off with yellow police tape.
At the police station, McDermott and another detective spoke to the renter of the vehicle, Deolinda Andrade. During the conversation, Andrade stated that she had given someone else permission to drive the rental car. McDermott informed Andrade that **701 she may have violated her rental agreement by allowing an unlisted individual to drive the vehicle. He then called the rental company and was informed that Andrade's rental agreement would be terminated due to the violation. Based on this information, McDermott decided not to release the vehicle to Andrade.
Several hours later, the police brought Melo to the police station so that he could look at the exterior of the vehicle. Melo immediately recognized the vehicle as the one he had observed the night before.
The following day, McDermott obtained written consent from the rental company *991 to search the vehicle. The vehicle was then transported to State Police headquarters, where it was searched.[5]
The defendant filed a pretrial motion to suppress, arguing that the stop, seizure, impoundment, and search of the Malibu violated his rights under Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. Specifically, the defendant sought to suppress the following evidence that resulted from the search: (i) Melo's identification of the vehicle, (ii) the exterior damage to the vehicle, and (iii) the fingerprints obtained from the vehicle. The motion was denied after a hearing.
b. Analysis. On appeal, the defendant reprises the arguments he made in support of his motion to suppress. He claims that the officers should not have stopped the Malibu once they realized that they had mistakenly identified the rear passenger, or at least that the stop should have been immediately discontinued. He also asserts that the officers had no basis to impound the vehicle or tow it to the police station, and that the subsequent search of vehicle was therefore unconstitutional. We agree that the stop should have been discontinued once the officers determined that Correia was not in the vehicle, and that the unnecessarily prolonged stop constituted an illegal seizure. We further conclude that, under the circumstances here, the evidence obtained from the subsequent impoundment and search of the Malibu was the direct result of the illegal seizure of the defendant, and that the Commonwealth has failed to meet its burden of proving that the evidence from the Malibu was sufficiently attenuated from the illegal seizure such that it should not be deemed a forbidden "fruit of the poisonous tree" under art. 14. Accordingly, the motion **702 judge erred in denying the defendant's motion to suppress the evidence obtained from the search of the Malibu.
i. Initial stop of the vehicle. Under the Fourth Amendment and art. 14, an individual has the right to be free from all unreasonable searches and seizures. Commonwealth v. Buckley, 478 Mass. 861, 865, 90 N.E.3d 767 (2018). A motor vehicle stop constitutes a seizure of all individuals detained in the stop. See Whren v. United States, 517 U.S. 806, 809-810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ; Commonwealth v. Rodriguez, 472 Mass. 767, 773, 37 N.E.3d 611 (2015). The police may stop a motor vehicle to "make a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime." Commonwealth v. Watson, 430 Mass. 725, 729, 723 N.E.2d 501 (2000), quoting Commonwealth v. Silva, 366 Mass. 402, 405, 318 N.E.2d 895 (1974). See Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In reviewing the constitutionality of a motor vehicle stop, we must determine "first, whether the initiation of the investigation by the police was permissible in the circumstances, and second, whether the scope of the search was justified by the circumstances." Commonwealth v. Moses, 408 Mass. 136, 140, 557 N.E.2d 14 (1990), citing Silva, supra at 405, 318 N.E.2d 895.
To effect a valid investigatory stop, the police must have reasonable suspicion of criminal activity "based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience."
*992 Silva, 366 Mass. at 406, 318 N.E.2d 895, citing Terry, 392 U.S. at 21, 88 S.Ct. 1868. Here, the officers had sufficiently articulable facts to support a reasonable suspicion that the passenger in the back seat of the vehicle had an active warrant for his arrest. Cf. Commonwealth v. Owens, 414 Mass. 595, 599, 609 N.E.2d 1208 (1993) (motor vehicle stop warranted by reasonable belief that registered owner, who had active warrant for his arrest, was driving vehicle). The motion judge credited Detective Schaaf's testimony that he had previous knowledge of Correia's active arrest warrant. Schaaf also testified that he was familiar with Correia's physical appearance. Although his view of the Malibu was both distant and brief, Schaaf's observation of the Malibu's occupants supported his reasonable, albeit mistaken, belief that Correia was the rear passenger. Cf. Commonwealth v. Garden, 451 Mass. 43, 46, 883 N.E.2d 905 (2008) (motor vehicle stop warranted by mistaken belief that registered owner was driving with suspended license). Thus, the motion judge properly concluded that the initial stop was reasonable.
ii. Duration of the stop. We must next determine whether the scope of the stop was justified under the circumstances. The **703 motion judge found that although Detective Schaaf quickly realized Correia was not the rear passenger, his request for Hanson's driver's license was a "minimal intrusion upon the operator." The motion judge also concluded that Schaaf acted reasonably in requesting the rental agreement, thereby continuing the stop, because he had received "concurrent conflicting information regarding who had rented and was legitimately responsible for the Malibu." We disagree.
A valid investigatory stop "cannot 'last longer than reasonably necessary to effectuate the purpose of the stop.' " Commonwealth v. Amado, 474 Mass. 147, 151, 48 N.E.3d 414 (2016), quoting Commonwealth v. Cruz, 459 Mass. 459, 465, 945 N.E.2d 899 (2011). See Commonwealth v. Sinforoso, 434 Mass. 320, 323, 749 N.E.2d 128 (2001). The scope of a stop may only extend beyond its initial purpose if the officer is confronted with facts giving rise to a reasonable suspicion that "further criminal conduct is afoot" (citation omitted). Commonwealth v. Cordero, 477 Mass. 237, 243, 74 N.E.3d 1282 (2017). Where an officer conducts an "uneventful threshold inquiry giving rise to no further suspicion of criminal activity, he may not prolong the detention or expand the inquiry" (citation omitted). Buckley, 478 Mass. at 873, 90 N.E.3d 767. See Commonwealth v. Gonsalves, 429 Mass. 658, 663, 711 N.E.2d 108 (1999) (noting that individuals do not expect police officers conducting traffic stops to engage in "stalling tactics, obfuscation, strained conversation, or unjustified exit orders, to prolong the seizure in the hope that, sooner or later, the stop might yield up some evidence of an arrestable crime").
Because the initial purpose of the stop in this case was to apprehend Correia, the stop should have concluded as soon as Detective Schaaf realized he had mistakenly identified the rear passenger, and nothing else had caused concern. At that moment, the officers had no reason to continue the stop. Garden, 451 Mass. at 46, 883 N.E.2d 905 (purpose of stop completed when officers discovered that registered owner of vehicle, who officers knew to have suspended license, was not driving). See Cordero, 477 Mass. at 242, 74 N.E.3d 1282, quoting Rodriguez v. United States, --- U.S. ----, 135 S. Ct. 1609, 1614, 191 L.Ed.2d 492 (2015) ("Police authority to seize an individual ends 'when tasks tied to the [detention] are -- or reasonably should have been -- completed' "). Thus, Detective Schaaf's request for Hanson's driver's license, coupled with his continued questioning *993 of the occupants, including the defendant, constituted an unlawful seizure of the Malibu and its occupants.
The Commonwealth argues that the officers acted reasonably in **704 extending the stop to clarify ownership of and responsibility for the Malibu. To the extent Detective Schaaf received conflicting information[6] from the occupants on this point, this exchange did not provide a sufficient basis to continue the stop for the purpose of investigating the Malibu's rental status. Schaaf credibly testified that he had no reason to believe that the Malibu had been stolen, or that Hanson lacked authorization from the renter to drive it. The record provides no evidence that the occupants appeared nervous or responded evasively to Schaaf's inquiries. The mere fact that the Malibu was rented,[7] without more, could not alone support a reasonable suspicion that the occupants were engaged in criminal conduct. See Commonwealth v. Locke, 89 Mass. App. Ct. 497, 502, 51 N.E.3d 484 (2016) (defendant's statement that another individual rented vehicle did not contribute to reasonable suspicion of criminal activity); Commonwealth v. Bartlett, 41 Mass. App. Ct. 468, 471, 671 N.E.2d 515 (1996) (officer's knowledge that vehicle was rented by another individual did not support reasonable suspicion that defendant was engaged in drug-related activity). Contrast Commonwealth v. Cabrera, 76 Mass. App. Ct. 341, 346-347, 921 N.E.2d 1026 (2010) (officer's knowledge that vehicle was rented, coupled with defendant's evasive explanation as to ownership of vehicle, contributed to reasonable suspicion of drug-related activity). In addition, the verbal exchange between Schaaf and the vehicle's occupants occurred after the officers had already completed the purpose of the stop. Therefore, Schaaf's knowledge of the vehicle's rental status derived solely from an "investigatory conversation for which [he] had no lawful basis." Bartlett, 41 Mass. App. Ct. at 472, 671 N.E.2d 515. The initial stop was therefore unreasonably extended and constituted an illegal seizure. Cf. Cordero, 477 Mass. at 247, 74 N.E.3d 1282 (where purpose of motor vehicle stop was effectuated, and where no reasonable suspicion of additional criminal activity, police "did not have a legitimate basis to detain the defendant, and the defendant should have been allowed to drive **705 away"); Commonwealth v. Torres, 424 Mass. 153, 163, 674 N.E.2d 638 (1997) (continued detention of passengers after purpose of stop had been satisfied constituted illegal seizure). See J.A. Grasso, Jr. & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 4-4[b] (2017) ("investigative detention must be temporary and must last no longer than necessary to effectuate the purpose of the stop"). The motion judge therefore erred in finding that the officers validly extended the scope of the initial stop.
iii. The impoundment and search of the Malibu as fruit of the poisonous tree. Rather than letting the occupants drive away in the vehicle, as the police were required to do, the police continued their investigatory questioning and eventually *994 forced the passengers out of the Malibu and impounded it. Evidence resulting from a subsequent search of the vehicle included Melo's identification of the vehicle as the one he had seen on the night of the shooting, the exterior damage to the vehicle, and the latent fingerprints belonging to the defendant obtained from the interior of the vehicle. The defendant argues that all of this evidence should have been suppressed under the exclusionary rule. We agree.
As an initial matter, the Commonwealth argues that the defendant does not have standing to challenge the admission of this evidence because, as the passenger of a rental vehicle operated by someone other than the renter, the defendant had no reasonable expectation of privacy in the impounded Malibu or its exterior. This argument, however, misses the mark.
Standing under the Fourth Amendment requires the defendant to establish a reasonable expectation of privacy in the area searched or the item seized. Commonwealth v. Mubdi, 456 Mass. 385, 391, 923 N.E.2d 1004 (2010). Under art. 14, by contrast, the question of standing remains separate from the question of reasonable expectation of privacy. Commonwealth v. Williams, 453 Mass. 203, 208, 900 N.E.2d 871 (2009) (standing and reasonable expectation of privacy are "interrelated," but considered "separately"). Ordinarily, a defendant has standing if he or she has either "a possessory interest in the place searched or in the property seized or if [he or] she was present when the search occurred."[8] Id.
**706 There is no question that the defendant had standing to challenge the legality of the seizure of his person when police stopped the Malibu and detained its occupants for an extended period of time. Whren, 517 U.S. at 809-810, 116 S.Ct. 1769 ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' " under Fourth Amendment). He also would reasonably expect that the police would leave him and the other passengers in the vehicle alone and let them drive away if the police had no proper reason for detaining them and the vehicle. See Gonsalves, 429 Mass. at 663, 711 N.E.2d 108 ("Citizens do not expect that police officers handling a routine traffic violation will engage, in the absence of justification, in stalling tactics, obfuscation, strained conversation, or unjustified exit orders, to prolong the seizure in the hope that, sooner or later, the stop might yield up some evidence of an arrestable crime" [emphasis added] ). Thus, at least during the unreasonably prolonged detention of the defendant and the vehicle in which he was traveling, there is no question that he had standing to challenge the seizure. As this prolonged detention was unconstitutional, and the evidence at issue flowed therefrom, the proper focus is on fruit of the poisonous tree, not whether the defendant had standing or a reasonable expectation of privacy in the Malibu at the time of its impoundment. See Commonwealth v. Fredericq, 482 Mass. 70, 78-79, 121 N.E.3d 166 (2019).
*995 "Under what has become known as the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the use of evidence derived from an unconstitutional search or seizure." Fredericq, 482 Mass. at 78, 121 N.E.3d 166. See Wong Sun v. United States, 371 U.S. 471, 487-488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In determining whether the evidence is considered a fruit of the poisonous tree, we consider " 'whether ... the evidence ... has been come at by exploitation of [that] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " Fredericq, supra, quoting Commonwealth v. Damiano, 444 Mass. 444, 453, 828 N.E.2d 510 (2005).
It matters not whether the defendant in this case had standing or a reasonable expectation of privacy in the Malibu once it was impounded by the police. As we have recently noted, evidence may be suppressed as fruit of the poisonous tree "even if it is found in a place where the defendant has no reasonable expectation **707 of privacy." Fredericq, 482 Mass. at 78, 121 N.E.3d 166, discussing Wong Sun, 371 U.S. at 486-487, 83 S.Ct. 407. Accordingly, we have held that persons subjected to an illegal seizure are "entitled to suppress the fruits of that seizure even where the evidence was discovered in places where it is indisputable that the person in question did not have a reasonable expectation of privacy." Fredericq, supra at 79, 121 N.E.3d 166.
The Commonwealth bears the burden of establishing that the evidence it has "obtained and intends to use is sufficiently attenuated from the underlying illegality so as to be purged from its taint" (quotation omitted). Id. at 78, 121 N.E.3d 166, quoting Damiano, supra at 454, 828 N.E.2d 510. We conclude that the Commonwealth has failed to meet that burden here.[9] The Commonwealth obtained the evidence identified supra as a direct result of the illegal seizure of the defendant and the car in which he was traveling. Indeed, without the illegal seizure, the police would have had no grounds to impound the vehicle and conduct a search of it. Rather, the defendant and the other occupants of the vehicle would have, and should have, been free to leave in the vehicle following the initial stop. The impoundment and subsequent search occurred close in time to the illegal seizure, and there were no intervening circumstances between the illegal conduct and the later discovery of the evidence that would have been sufficient to dissipate the taint of the illegal seizure. See Commonwealth v. Long, 476 Mass. 526, 536, 69 N.E.3d 981 (2017) (factors bearing on attenuation include "length of time between the [illegal act] and the discovery of the evidence [temporal attenuation]; whether any circumstances intervened between the illegal act and the discovery of the evidence [intervening circumstances]; and how integral the unlawful search was to the acquisition of the evidence [purpose and flagrancy of the unlawful conduct]"). Although the illegal police misconduct here may not have been flagrant, this factor is not dispositive when balanced against the other two. Cf. Fredericq, 482 Mass. at 81-85, 121 N.E.3d 166 (no attenuation where evidence was obtained in close proximity to illegality and there were no intervening circumstances, even where police misconduct was neither flagrant nor purposeful); Commonwealth v. Estabrook, 472 Mass. 852, 864-865, 38 N.E.3d 231 (2015) (same). Accordingly, the seizure of *996 the evidence from the Malibu was derived as a result of the exploitation of the illegal seizure, rather than by "means sufficiently distinguishable to be purged of the **708 primary taint" (citation omitted). Damiano, 444 Mass. at 453, 828 N.E.2d 510.
The evidence therefore should have been suppressed as the fruit of the poisonous tree. Cf. Torres, 424 Mass. at 163, 674 N.E.2d 638 (continued detention of defendant and passenger no longer necessary after defendant satisfied purpose of stop by producing license and registration; all evidence seized after that point suppressed as fruit of poisonous tree). Its admission in evidence at trial was thus error.[10]
*997 **709 iv. Harmless error. Because the defendant moved to suppress this evidence before trial, we review the constitutional error to determine whether it was harmless beyond a reasonable doubt. Commonwealth v. Tyree, 455 Mass. 676, 700, 919 N.E.2d 660 (2010), quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Our review under this standard considers a number of factors, including:
"[1] the importance of the evidence in the prosecution's case; [2] the relationship between the evidence and the premise of the defense; [3] who introduced the issue at trial; [4] the frequency of the reference; [5] whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; [6] the availability or effect of curative instructions; and [7] the weight or quantum of evidence of guilt."
Commonwealth v. Seino, 479 Mass. 463, 467-468, 96 N.E.3d 149 (2018), quoting Commonwealth v. Dagraca, 447 Mass. 546, 553, 854 N.E.2d 1249 (2006). We then must decide, based "on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, [whether] we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts." Tyree, 455 Mass. at 701, 919 N.E.2d 660.
The evidence obtained from the Malibu and introduced in evidence by the Commonwealth was particularly important in connecting the defendant to the shooting. Through Melo's trial testimony and the distinctive scraping found underneath the car, the Commonwealth sought to prove that the impounded Malibu was the suspect vehicle involved in the shooting. At trial, Melo **710 testified that he saw a gold or tan Chevy Malibu round the corner near his house, hit the curb on the right side of the intersection, and drive down his street at a high rate of speed. Melo's testimony was compelling, particularly because he stated that the bottom of the right side of the Malibu would have distinctive scrape marks from when the vehicle rounded the turn, and the car proved to have such marks. Melo also unequivocally identified the Malibu once he saw it at the station. This identification was corroborated by police testimony demonstrating that the Malibu's exterior damage was consistent with damage to the Altima that Lima was driving at the time of the shooting.
Although this evidence does not conclusively connect the defendant to the crime, his presence in the Malibu the following day strongly suggested his involvement in the murder. The Commonwealth unmistakably relied on this evidence, highlighting its significance during opening and closing arguments. Indeed, without the evidence obtained from the Malibu, the Commonwealth's case falls predominantly on Grinion's testimony and ballistics evidence collected from the scene. Although this untainted evidence was sufficient to convict the defendant, we cannot say that it was "so powerful as to nullify any effect that the improperly admitted evidence might have had" on the jury or the verdict (quotations and citations omitted). Commonwealth v. Dame, 473 Mass. 524, 537, 45 N.E.3d 69, cert. denied, --- U.S. ----, 137 S. Ct. 132, 196 L.Ed.2d 103 (2016). As Grinion was an informant with a troubled history, his credibility was vulnerable. We *998 therefore conclude that the erroneous admission of evidence deriving from the illegal seizure of the defendant was not harmless beyond a reasonable doubt. The defendant's convictions must therefore be vacated.
Because the evidence was sufficient to support a conviction without the evidence derived from the illegal seizure, we address other claims of error that are likely to recur upon retrial.[11]
**711 2. Prior bad acts evidence. The defendant claims that the trial judge erred in admitting evidence relating to the defendant's involvement in a prior shooting. On April 28, 2007, less than one month before the Main Street shooting on May 21, 2007, there was a shooting on Exchange Street in Brockton. The police recovered three .22 caliber shell casings from the scene of the Exchange Street shooting. They later found ten .22 caliber shell casings and four .40 caliber shell casings at the scene of the Main Street shooting.
At trial, the jury heard testimony about the defendant's involvement in the prior Exchange Street shooting. Grinion testified that the defendant told him that he had used a .22 caliber handgun -- the same handgun Grinion recovered from a controlled purchase on May 28, 2007 -- in a shooting on Exchange Street the previous month. Ortega also testified that the defendant admitted to his involvement in a prior shooting on Exchange Street. Both witnesses testified that they had seen the defendant in possession of the .22 caliber handgun on more than one occasion prior to May 21, 2007.
A ballistics expert examined the three .22 caliber casings from the Exchange Street shooting and the ten .22 caliber casings from the Main Street shooting. He also test-fired the .22 caliber handgun that Grinion retrieved from the defendant. At trial, the expert testified that eight out of the ten casings from Main Street and all three of the casings from Exchange Street were fired from that same .22 caliber handgun.
This evidence was the subject of a motion in limine at trial. After hearing from both parties, the trial judge allowed the admission of this evidence, concluding that it was relevant to identify the defendant as the person who shot Lima, and to show that he had the means to commit the crime. In his postconviction motion for a new trial, the defendant argued that the probative value of this evidence was substantially outweighed by its prejudicial effect.
*999 The motion judge, who was also the trial judge, denied the motion.
**712 As the defendant objected to the admission of this evidence at trial, we review for prejudicial error. See Commonwealth v. Imbert, 479 Mass. 575, 586, 97 N.E.3d 335 (2018). We must first determine whether the judge committed an error of law or an abuse of discretion. Commonwealth v. Camacho, 472 Mass. 587, 591, 36 N.E.3d 533 (2015). A judge's discretionary decision constitutes an abuse of discretion where the judge makes a "clear error of judgment in weighing the factors relevant to the decision ... such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27, 20 N.E.3d 930 (2014). If we find such an error, we then ask whether it was prejudicial. Commonwealth v. Cruz, 445 Mass. 589, 591, 839 N.E.2d 324 (2005).
As a general rule, evidence of a defendant's prior bad act is inadmissible to show the defendant's bad character or propensity to commit a crime. Commonwealth v. Jackson, 417 Mass. 830, 835, 633 N.E.2d 1031 (1994). See Mass. G. Evid. § 404(b)(1) (2019). This type of evidence may be admissible, however, if it is relevant "for some other purpose ... such as to show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive" (citation omitted). Commonwealth v. Copney, 468 Mass. 405, 412, 11 N.E.3d 77 (2014). See Mass. G. Evid. § 404(b)(2). It may also be admitted to show that the defendant had the means to commit the crime. Commonwealth v. Ridge, 455 Mass. 307, 322, 916 N.E.2d 348 (2009). The trial judge must exclude such evidence, even if relevant, where its probative value is outweighed by the risk of unfair prejudice. Commonwealth v. Crayton, 470 Mass. 228, 249, 21 N.E.3d 157 (2014). Where a trial judge admits evidence of a defendant's prior bad act, the court must determine whether the judge committed palpable error. Commonwealth v. Corliss, 470 Mass. 443, 450, 23 N.E.3d 92 (2015).
To admit a defendant's prior bad act as relevant to identity, there must be "a special mark or distinctiveness in the way the acts were committed" that tends to prove the defendant committed the crime charged. Commonwealth v. Brusgulis, 406 Mass. 501, 505, 548 N.E.2d 1234 (1990). It is not enough that there is some "general, although less than unique or distinct, similarity between the incidents." Id. at 507, 548 N.E.2d 1234. In addition, the prior incident and the crime charged must be proximate in both time and place. Commonwealth v. Leonard, 428 Mass. 782, 786, 705 N.E.2d 247 (1999).
In this case, the trial judge concluded that evidence of the defendant's involvement in the prior Exchange Street shooting was relevant to prove his identity as the shooter who killed Lima. We agree. Based on the defendant's own admissions to Grinion **713 and Ortega, the jury could have reasonably concluded by a preponderance of the evidence that the defendant used a .22 caliber handgun in the prior Exchange Street shooting. See Commonwealth v. Kater, 432 Mass. 404, 415, 734 N.E.2d 1164 (2000) ; Mass. G. Evid. § 104(b). See also Commonwealth v. Meola, 95 Mass. App. Ct. 303, 308 n. 13, 125 N.E.3d 103 (2019), quoting Huddleston v. United States, 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The ballistics evidence admitted at trial linked this same .22 caliber handgun to both the Exchange Street shooting and the Main Street shooting. In addition, these two shootings were proximate in both time and place, as they each occurred in Brockton approximately one *1000 month apart. See Commonwealth v. Helfant, 398 Mass. 214, 228 n.13, 496 N.E.2d 433 (1986) ("There is no bright-line test for determining temporal remoteness of evidence of prior misconduct"). Additionally, this evidence corroborated Grinion's testimony that the defendant had been involved in the Exchange Street shooting. Thus, the trial judge properly concluded that evidence of the defendant's involvement in the prior Exchange Street shooting was relevant to establish his identity as the shooter in this case.
Furthermore, evidence that the defendant possessed the .22 caliber handgun, and used it in the prior shooting, was also relevant to show that he had the means to commit the crime. See Commonwealth v. Barbosa, 463 Mass. 116, 122, 972 N.E.2d 987 (2012) ("A weapon that could have been used in the course of a crime is admissible, in the judge's discretion, even without direct proof that the particular weapon was in fact used in the commission of the crime"). See also Commonwealth v. Vazquez, 478 Mass. 443, 448-449, 85 N.E.3d 973 (2017) (witness testimony that defendant was observed with firearm one month prior to shooting was admissible absent definitive evidence that firearm was not murder weapon); Commonwealth v. McGee, 467 Mass. 141, 156, 4 N.E.3d 256 (2014) (evidence that defendant possessed firearm consistent with type of weapon used to kill victim was admissible to show that defendant had means to commit crime); Commonwealth v. Ashman, 430 Mass. 736, 744, 723 N.E.2d 510 (2000) (evidence of two knives found in defendant's bedroom four days after victim's death was admissible where one knife matched description of murder weapon).
Finally, we find that the trial judge correctly concluded that the probative value of the evidence was not outweighed by the risk of unfair prejudice. At trial, the judge limited the evidence to testimony that the defendant admitted to possessing and shooting the .22 caliber handgun in the prior Exchange Street shooting, and **714 ballistics evidence that the same .22 caliber handgun was used in the shooting of Lima. The jury were not permitted to hear evidence that the defendant shot, or intended to shoot, anyone in the Exchange Street shooting.[12] In addition, the judge instructed the Commonwealth to use leading questions so as to limit the testimony presented. In light of the highly probative nature of the evidence, we find that these restrictions adequately prevented any prejudice to the defendant. We therefore find no error in the judge's decision to admit evidence of the defendant's prior bad acts.
3. Motions for postconviction discovery and a new trial. Prior to trial, defense counsel was provided copies of the wiretap recordings obtained by Grinion through his work as a confidential informant. Defense counsel moved to suppress the recordings, which consisted of conversations among the defendant, Ortega, and Grinion occurring between May 29 and 31, 2007. These recordings were authorized by a search warrant pursuant to G. L. c. 272, § 99, and Commonwealth v. Blood, 400 Mass. 61, 66, 507 N.E.2d 1029 (1987).
In support of the motion to suppress, trial counsel successfully argued that the wiretap recordings were obtained unlawfully, in violation of G. L. c. 272, § 99 B 7, because the investigation was not in connection with organized crime. The motion was allowed and upheld by this court on *1001 appeal. See generally Commonwealth v. Tavares, 459 Mass. 289, 290, 945 N.E.2d 329 (2011). The suppressed recordings were not admitted at trial, nor was there any mention that the defendant's conversations were recorded.
Following his conviction, the defendant filed a motion for a new trial, arguing that his trial counsel was constitutionally ineffective in failing to seek the suppression of evidence derived from the wiretap recordings pursuant to G. L. c. 272, § 99 P. He also filed a motion for postconviction discovery to obtain copies or transcripts of the wiretap recordings. The motion judge, who was also the trial judge, denied the motions.[13] The defendant now appeals. As we have determined that a new trial is required due to the failure to suppress the evidence derived from the motor vehicle stop, we only resolve those issues necessary for any subsequent trial.
**715 Under the Massachusetts wiretap statute, a criminal defendant "may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom" if the interception was made in violation of the statute. G. L. c. 272, § 99 P. A witness's live testimony about a recorded conversation, however, need not be suppressed if it is "not the product of an unauthorized interception but is independent of it." Commonwealth v. Jarabek, 384 Mass. 293, 299-300, 424 N.E.2d 491 (1981). By contrast, the testimony should be suppressed if the witness relies on his or her "listening to the unlawfully obtained recording." Id. at 300 n.7, 424 N.E.2d 491. See Commonwealth v. Ortiz, 431 Mass. 134, 142, 725 N.E.2d 1030 (2000) (no error in admitting undercover officer's live testimony based on his "investigation and recollection of the criminal events").
We agree with the motion judge's finding that the defendant failed to identify any specific evidence admitted at trial that was derived from the unlawful recordings. The suppressed recordings were not admitted as evidence, nor was there any mention at trial that the defendant's conversations were recorded. During the pretrial proceedings, trial counsel reminded the court that the wiretap recordings had been suppressed, and reiterated his concern that one of the witnesses would inadvertently discuss the recordings. In his affidavit, trial counsel also stated that he did not file a motion to suppress because he "did not think that any evidence had been derived from the wiretap recordings involved in this case."
The defendant has thus failed to demonstrate with any specificity how the unlawful recordings may have affected the admissibility of Grinion's trial testimony. The defendant argues more persuasively, however, that his ability to do so was hamstrung completely by the denial of his motion for posttrial discovery of the recordings themselves. The defendant asserts that, without access to the recordings on appeal, he could not effectively argue in support of his motion for a new trial. An examination of the recordings, he contends, is necessary to identify the specific evidence introduced at trial which derived from the recordings. He further asserts that the Commonwealth's "refusal to produce the tape or transcript of the illegal wiretap" violated his constitutional right to due process of law under both the Federal and State Constitutions. See *1002 Brady v. Maryland, 373 U.S. 83, 87-88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ; Commonwealth v. Tucceri, 412 Mass. 401, 405, 589 N.E.2d 1216 (1992).
Although we need not decide whether a new trial is warranted for this reason alone, we conclude that the defendant is entitled to **716 another copy of the transcript prior to any retrial. This transcript will enable defense counsel to examine whether there is any improper reliance on the suppressed recordings at any future trial. Grinion's testimony will be critical at any subsequent retrial, providing further justification for defense counsel's access to the suppressed recordings.
Because the defendant is entitled to discovery of the recordings, we need not address the validity of his constitutional claims. The Commonwealth is hereby ordered to disclose the suppressed wiretap recordings, or a copy of the recording transcripts, to the defendant prior to any retrial.
Conclusion. For the foregoing reasons, we reverse the denial of the defendant's motion to suppress, vacate the defendant's convictions, and remand for a new trial consistent with this opinion.
So ordered.

The defendant was also found guilty of armed assault with intent to murder and unlawful possession of a firearm.

Because we vacate the defendant's convictions, the defendant's additional claim of error set forth in a separate brief that he contends is filed in accordance with Commonwealth v. Moffett, 383 Mass. 201, 208-209, 418 N.E.2d 585 (1981), and which concerns the adequacy of the trial judge's instruction on proof beyond a reasonable doubt, is moot.

Before meeting with the defendant, Grinion allowed the police to search his person and his motor vehicle. The police then followed Grinion's vehicle to the Fall River apartment, where he met with the defendant. When Grinion left the apartment, the police immediately stopped him to retrieve the gun.

Detective Schaaf testified that he recognized the defendant as the front passenger and Ortega as the rear passenger, and that although he could not remember the name of the driver (Hanson), he had spoken with him on previous occasions.

In the course of the search, the investigators obtained latent fingerprints from the vehicle's interior. An expert witness later testified at trial that three of these prints were individualized to the defendant.

The motion judge found that Hanson initially informed Detective Schaaf that the defendant had rented the Malibu, but that the defendant then stated that his girlfriend was in fact the renter.

During his initial verbal exchange with the occupants, Detective Schaaf had not yet reviewed, or requested to see, the rental agreement. Before reviewing the agreement, he had no basis to believe that the occupants lacked authority to operate the Malibu. See Commonwealth v. Campbell, 475 Mass. 611, 622, 59 N.E.3d 394 (2016) ("absence of the defendant's name on the rental agreement provided [the officer] with a basis to investigate whether the authorized renter had permitted the defendant to use the vehicle").

For possessory offenses, including passengers in automobiles, we have concluded that defendants have automatic standing. Commonwealth v. Mubdi, 456 Mass. 385, 392, 923 N.E.2d 1004 (2010). We also have concluded that passengers in an automobile subject to extensive global positioning system or cell site location information monitoring likewise have standing, even when they have no possessory interest in the automobile, as their reasonable expectations of privacy are implicated. See Commonwealth v. Fredericq, 482 Mass. 70, 77-78, 121 N.E.3d 166 (2019) ; Commonwealth v. Rousseau, 465 Mass. 372, 382, 990 N.E.2d 543 (2013).

Indeed, apparently content with its argument that the stop of the vehicle did not amount to an illegal seizure, the Commonwealth did not even argue attenuation on appeal.

As we conclude that the defendant had standing to challenge the prolonged detention of his person and the vehicle in which he was traveling, and that the evidence at issue derived from this unconstitutional seizure was thus the fruit of the poisonous tree, we need not resolve the issue of whether he would otherwise have had standing to challenge the impoundment and ultimate search of the Malibu where he was neither the person who rented the vehicle nor the driver. We do note, however, that the impoundment of the vehicle was improper. We addressed this issue in Campbell, 475 Mass. at 612, 59 N.E.3d 394, where a lawful stop of an automobile for a traffic violation ended in an impoundment of the vehicle once the officer discovered that the operator of the rental car was not authorized by the rental agreement. In that case, the operator was the son of the person who rented the car. Id. As we explained, "[a] renter's decision to allow a person who is not a permitted driver according to the rental agreement to drive a rental vehicle may be a breach of that agreement, but it does not also result in a violation of criminal law." Id. at 620-621, 59 N.E.3d 394. We therefore determined that the impoundment was unreasonable, concluding that "the absence of the defendant's name on the rental agreement ... by itself could not establish probable cause to conclude that the defendant was in violation of the statute [G. L. c. 90, § 24 (2) (a ) ]," id. at 622, 59 N.E.3d 394, which provides, in relevant part, "whoever uses a motor vehicle without authority knowing that such use is unauthorized shall ... be punished," id. at 616, 59 N.E.3d 394.
Here, Detective Schaaf testified at the motion hearing that he decided to tow the Malibu because the rental agreement did not list any of the occupants as authorized operators. As in Campbell, this finding alone is not sufficient to find probable cause for a statutory violation and impoundment of the motor vehicle. Schaaf testified that Hanson produced a valid driver's license and that the detective did not believe the vehicle was stolen. It appears, then, that "[o]ther than the fact that [the driver's] name was not on the rental agreement, [the officers] had no basis to believe" that use of the vehicle was unauthorized. Id. at 613, 59 N.E.3d 394. See Commonwealth v. Locke, 89 Mass. App. Ct. 497, 502, 51 N.E.3d 484 (2016) (no basis to continue motor vehicle stop, despite absence of driver's name on rental agreement, where driver produced valid driver's license and informed officer that renter provided permission).
There was also no other basis to seize, impound, and search the vehicle. According to Schaaf's testimony, the detective did not suspect that the vehicle was connected to the shooting until after he had ordered the occupants out of the vehicle. Nor could he have had a reasonable basis to do so. The detained Malibu varied substantially from Melo's description of the suspect vehicle. Whereas Melo described a gold or tan Chevy Malibu "Max," Schaaf had observed a regular "grayish-green" Chevy Malibu. The record does not show, and the motion judge did not find, that Schaaf made any effort to examine the exterior vehicle damage prior to towing the vehicle. Although he did observe that the detained Malibu had a "sloped back," this alone was insufficient to link the vehicle to the previous night's shooting. See Commonwealth v. A Juvenile (No. 2), 411 Mass. 157, 162-163, 580 N.E.2d 1014 (1991) (probable cause to conduct warrantless search of vehicle where physical evidence collected from scene of hit-and-run accident matched fibers found on vehicle exterior); Commonwealth v. Rand, 363 Mass. 554, 560, 296 N.E.2d 200 (1973) (probable cause to conduct warrantless search where vehicle's color, appearance, and exterior damage were consistent with witness description of prior hit-and-run accident). In addition, neither the vehicle's physical location at the time of the stop nor its temporal proximity to the shooting could support a finding of reasonable suspicion or probable cause. Cf. Commonwealth v. Holness, 93 Mass. App. Ct. 368, 373-374, 101 N.E.3d 310 (2018) (probable cause to search vehicle identified several minutes after fatal shooting where stop occurred one-half mile from scene of crime).

The defendant may be retried only if the untainted evidence admitted at trial, when viewed in a light most favorable to the Commonwealth, was sufficient to support his conviction. See Commonwealth v. Jansen, 459 Mass. 21, 27, 942 N.E.2d 959 (2011) ; Berry v. Commonwealth, 393 Mass. 793, 798, 473 N.E.2d 1115 (1985). See also Commonwealth v. Latimore, 378 Mass. 671, 677, 393 N.E.2d 370 (1979). At trial, Grinion and Ortega testified extensively about the various incriminating statements the defendant made in the days following the shooting. Despite the defendant's attempts to discredit these witnesses, the testimony was sufficient to support a guilty verdict. The Commonwealth also introduced ballistics evidence linking the defendant's .22 caliber handgun to several spent shell casings found at the scene of the crime. Based on this evidence, a rational jury could have found the essential elements of murder in the first degree beyond a reasonable doubt. Id. See Commonwealth v. Morgan, 449 Mass. 343, 351, 868 N.E.2d 99 (2007) (defendant's possession of two weapons consistent with murder weapon supported finding that defendant shot victim); Commonwealth v. Chipman, 418 Mass. 262, 267-268, 635 N.E.2d 1204 (1994) (defendant's inculpatory statements to friends following victim's death supported finding that defendant killed victim). Therefore, double jeopardy principles do not bar a retrial of this case. See Commonwealth v. Fitzpatrick, 463 Mass. 581, 589, 977 N.E.2d 505 (2012).

Prior to the jury charge, defense counsel asked the judge not to instruct the jury as to the admissibility of evidence relating to the defendant's prior bad acts because he did not wish to call the jury's attention to this evidence.

The defendant filed a petition with this court seeking review of the denial of his motions pursuant to G. L. c. 211, § 3. A single justice denied the petition, as well as a subsequent motion for reconsideration. This court affirmed that decision. See generally Tavares v. Commonwealth, 478 Mass. 1024, 89 N.E.3d 1168 (2018).