NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-217

COMMONWEALTH

vs.

LORNE D. DYSON.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

While responding to a ShotSpotter[1] activation, two police officers stopped a car driven by the defendant, issued an exit order, searched the occupants and an area of the car, and discovered a firearm under the driver's seat.  The defendant was charged with carrying a loaded and unloaded firearm without a license, G. L. c. 269, §§ 10 (a), (n), removing the serial number of a firearm, G. L. c. 269, § 11C, and possession of ammunition without an FID card, G. L. c. 269, § 10 (h) (1). After his motion to suppress was denied, the defendant filed this interlocutory appeal challenging the exit order, the searches of his person and the car, and the admission of his

_____

[1] See Commonwealth v. Watson, 487 Mass. 156, 157 n.2 (2021) ("ShotSpotter uses sensors to detect a possible gunshot and approximates its location").

pre-Miranda statement that he did not have a firearm license. We affirm.

Background. We recite the facts from the motion judge's findings, supplemented by other evidence in the record that supports the judge's conclusion and that was either explicitly or implicitly credited by the judge. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 437-438 (2015). Around 1:24 A.M., two police officers were dispatched to a ShotSpotter activation. When the officers were "approximately one mile" from the activation site, they saw someone driving a car as if "in a hurry"; the car's headlights were off. Noticing that the car also had a brake light out, the officers initiated a traffic stop at about 1:26 A.M.

From the cruiser, the officers shined a spotlight into the driver's side mirror. One officer saw the driver (the defendant) look back at the officers, lean down to his right about a foot out of their view, and return, moments later, to a seated position. At that point, the officers approached the car and saw three men inside.

The officers asked the defendant where he was coming from and where he was going. The defendant said he was driving from Stash's Pizza (the restaurant) to his home in Avon. This statement "struck a chord" with the officers, who knew that the restaurant was a five-minute drive from where they stopped the

2

defendant, that the restaurant had closed almost thirty minutes earlier, and that the defendant was driving away from, rather than toward, Avon.

The officers returned to their cruiser and, from that vantage point, saw the defendant looking back at them in the driver's side mirror and fidgeting in his seat while the other passengers sat still.  After learning that the two passengers had prior convictions for possession of a firearm, the officers returned to the car and asked if any of the occupants had weapons.  All three men shook their heads "no."

By that point, an additional officer had arrived on the scene.  The occupants were ordered out of the car.  Although the two passengers immediately got out, the defendant twice refused; instead, he picked up a plate of food and began eating it. After a third exit order, the defendant complied.  He was pat frisked and the officers found nothing on his person.  An officer then looked under the driver's seat and immediately found a firearm.  The three men were handcuffed, and one officer demanded to see the defendant's license to carry.  The defendant stated that he did not have one.

The defendant moved to suppress the fruits of the search, including all the statements he made and the physical items recovered, arguing that the evidence was obtained in violation of his rights under both the United States Constitution and art.

3

14 of the Massachusetts Declaration of Rights. After an evidentiary hearing, the judge denied the motion, finding that, by the time the police issued the exit order, they had reasonable suspicion to believe that a crime had been committed, and even if not, they had a reasonable basis to believe their safety may be in danger, justifying an exit order even if the stop were viewed as a routine traffic stop. With respect to the patfrisk, the motion judge found that the defendant's resistance to the exit order added to the basis for the officers' reasonable suspicion that the defendant was armed and dangerous. These same facts, according to the motion judge, further justified the limited search of the vehicle. Finally, relying on Commonwealth v. Haskell, 438 Mass. 790, 796 (2003), the judge found that the defendant's response to the demand to see his license to carry was not the result of custodial interrogation. The defendant moved, unsuccessfully, for reconsideration and this appeal followed.[2]

Discussion. "When reviewing a motion to suppress evidence, we adopt the motion judge's subsidiary findings of fact absent clear error, but we independently determine the correctness of

---

[2] A single justice of the Supreme Judicial Court allowed the defendant's application, pursuant to Mass. R. Crim. P. 15 (a) (2), as amended, 476 Mass. 1501 (2017), for leave to pursue an interlocutory appeal in the Appeals Court. See Commonwealth v. Privette, 491 Mass. 501, 506 (2023).

4

the judge's application of constitutional principles to the facts as found." Commonwealth v. Catanzaro, 441 Mass. 46, 50 (2004).

1. Exit Order. "Our analysis begins with the validity of the exit order because there is no dispute that the initial stop of the . . . vehicle was valid." Commonwealth v. Monell, 99 Mass. App. Ct. 487, 489 (2021). "[A]n exit order is justified during a traffic stop where," among other reasons, "police are warranted in the belief that the safety of the officers or others is threatened" -- that is, "if officers have a reasonable suspicion of a threat to safety." Commonwealth v. Torres-Pagan, 484 Mass. 34, 38 (2020). "We assess 'whether there were facts and circumstances in the course of [the] particular traffic stop that, viewed objectively, would give rise to a heightened awareness of danger on the part of the [officer].'" Commonwealth v. Rosado, 84 Mass. App. Ct. 208, 212 (2013), quoting Commonwealth v. Stampley, 437 Mass. 323, 326 (2002). "A police officer need point only to some fact or facts in the totality of the circumstances that would . . . warrant an objectively reasonable officer in securing the scene in a more effective manner." Rosado, supra. "[I]t does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns." Commonwealth v. Gonsalves, 429 Mass. 658, 664 (1999).

5

Here, safety concerns justified the exit order.  The officers saw the defendant driving as if "in a hurry," in the early-morning darkness, without headlights, just one mile from the ShotSpotter activation two minutes earlier.  See Commonwealth v. Warren, 475 Mass. 530, 536 (2016); Commonwealth v. Ford, 100 Mass. App. Ct. 712, 716 (2022) (reasonable to infer from ShotSpotter alerts that person responsible for gunshots would be at or near location where ShotSpotter had last activated).  Aware that a shooter potentially remained at large, the officers saw the defendant bend down in a manner that reasonably could be perceived as retrieving or placing an object near the driver's seat.  See Commonwealth v. Heughan, 40 Mass. App. Ct. 102, 104-105 (1996).  Then, the officers heard the defendant's claim to be coming from a nearby restaurant they knew had closed thirty minutes earlier, and saw he was heading in the opposite direction from his purported destination.[3]  See Commonwealth v. Henley, 488 Mass. 95, 103 (2021) (defendant's

---

[3] "That there may be an innocent explanation for the defendant's actions 'does not remove [those actions] from consideration in the reasonable suspicion analysis.'"  Commonwealth v. Gomes, 453 Mass. 506, 511 (2009), quoting Commonwealth v. DePeiza, 449 Mass. 367, 373 (2007).  Moreover, we disagree with the defendant's assertion that the officers' questions about where he was coming from and going were improper because they crossed the line into general investigative questioning.  See Commonwealth v. Mathis, 76 Mass. App. Ct. 366, 372 n.13 (2010). In any event, even without considering the defendant's responses, we would still conclude there were sufficient safety concerns to justify the exit order.

6

implausible explanation to officers' questions contributed to reasonable suspicion).  The officers also saw the defendant exhibit "non-standard" and nervous behavior, repeatedly glancing at them and fidgeting in the front seat.  See Commonwealth v. Karen K., 491 Mass. 165, 179 (2023) (nervous movements may be properly considered with other factors to find reasonable suspicion).  In the aggregate, these facts were enough to cause "'a heightened awareness of danger that would warrant an objectively reasonable police officer'" to fear for his safety. Monell, supra at 490, quoting Stampley, 437 Mass. at 326.

2.  Patfrisk.  "[T]o justify a patfrisk, an officer needs more than safety concerns."  Torres-Pagan, 484 Mass. at 37. "[The officer] must have a reasonable suspicion, based on specific articulable facts, that the suspect is armed and dangerous."  Id. at 38-39.  "The calculus of reasonable suspicion examines 'the totality of the facts'" surrounding the patfrisk,  Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 8 (2023), quoting Commonwealth v. Meneus, 476 Mass. 231, 235 (2017), and "[r]easonable suspicion must be more than a hunch." Robinson-Van Rader, 492 Mass. at 8.

Here, the totality of the facts provided reasonable suspicion and supported the protective frisks of the defendant's person and limited sweep of the car.  The same facts justifying the exit order, combined with the defendant's resistance to the

officer's first two exit orders, provided reasonable suspicion to believe that the defendant had attempted to retrieve or conceal a weapon on or near his person.  See Commonwealth v. Narcisse, 457 Mass. 1, 9 (2010) (suspicions that defendant committed crime and was armed and dangerous "may occur simultaneously"); Commonwealth v. Johnson, 82 Mass. App. Ct. 336, 340 (2012) (that defendant was nervous and slow to obey officers' commands were factors considered in reasonable suspicion analysis).  Both passengers' histories of firearms offenses, viewed in the context of the nearby ShotSpotter activation, added to the reasonable suspicion that the defendant was armed and dangerous.  See Commonwealth v. Sweeting-Bailey, 488 Mass. 741, 750-751, 755-756 (2021); Commonwealth v. Wright, 85 Mass. App. Ct. 380, 384 (2014).

The officers' reasonable suspicion that the defendant was armed and dangerous did not dissipate when no weapon was discovered on his person; rather, the defendant's "[v]ery, very hesitant, and not cooperative" demeanor during the patfrisk only furthered the officers' "concern that a weapon might remain in the car."  Monell, supra at 491.  Given that "gestures . . . suggestive of the occupant's retrieving or concealing an object, raise legitimate concerns to an officer conducting a traffic stop," we are satisfied that officers were justified in

8

performing a protective search of the area of the car where they saw the defendant duck down.[4]  Stampley, 437 Mass. at 327.

3.  Length of stop.  "A valid investigatory stop 'cannot last longer than reasonably necessary to effectuate the purpose of the stop.'"  Commonwealth v. Tavares, 482 Mass. 694, 703 (2019), quoting Commonwealth v. Amado, 474 Mass. 147, 151 (2016).  "The scope of a stop may only extend beyond its initial purpose if the officer is confronted with facts giving rise to a reasonable suspicion that 'further criminal conduct is afoot'" (citation omitted).  Tavares, supra, quoting Commonwealth v. Cordero, 477 Mass. 237, 243 (2017).

Here, what began as a routine traffic stop was quickly transformed into a situation potentially dangerous to the officers.  The officers saw the defendant's furtive movements before he exited the cruiser and grew increasingly suspicious as they spoke with him and continued to observe his behavior.  See Sweeting-Bailey, 488 Mass. at 748-749; see also Commonwealth v. Cabrera, 76 Mass. App. Ct. 341, 346-347 (2010).  Contrast Cordero, 477 Mass.at 247 (where purpose of motor vehicle stop was effectuated, and where no reasonable suspicion of additional criminal activity existed, police "did not have a legitimate

---

[4] Because the officer found the gun immediately upon looking at the area where he saw the defendant duck down, and because nothing was found elsewhere in the vehicle, we do not address the propriety of the broader search.

9

basis to detain the defendant, and the defendant should have been allowed to drive away").

4. _License to carry_.  The defendant's statement that he did not have a license to carry, made in response to the officer's demand to see his license to carry a firearm, was not obtained in violation of the defendant's Miranda rights.  "The Miranda warnings are designed to protect the integrity of a suspect's privilege against self-incrimination."  _Haskell_, 438 Mass. at 796.  "Although this privilege protects a suspect's testimonial communications, it does not permit a suspect to refuse to produce real or physical evidence (such as a license) when lawfully ordered to do so."  _Id_.  "It would serve no purpose to advise a suspect that he has a right to remain silent when the police are only demanding the production of physical evidence that the suspect may not withhold.  The police, therefore, need not administer Miranda warnings before demanding that a suspect in custody produce one of the documents listed in [G. L. c. 140,] § 129C."  _Id_.

Here, as the motion judge found, the defendant's inability to produce a license to carry did not implicate the protections of the Fifth Amendment.  See _Haskell_, _supra_ at 796 n.2., quoting _Baltimore City Dep't of Social Servs_. v. _Bouknight_, 493 U.S. 549, 555 (1990) ("a person may not claim the [Fifth] Amendment's protections based upon the incrimination that may result from

10

the contents or nature of the thing demanded").  Although the defendant was handcuffed and under arrest, the demand to produce his license to carry did not constitute custodial interrogation under <u>Haskell</u>.

<u>Order denying motion to
   suppress affirmed</u>.

By the Court (Green, C.J.,
  Shin & Hershfang, JJ.[5]),

*Joseph F. Stanton*

Clerk

Entered:  August 9, 2023.

---

[5] The panelists are listed in order of seniority.